John G. **SWINNEY** and **R. S. Dickson
and Company**, a North Carolina Corporation, on behalf of themselves and
all others similarly situated, Plaintiffs,

v.

**KEEBLER COMPANY** et al., Defendants.

Civ. A. No. 68–616.

United States District Court,
D. South Carolina,
Greenville Division.

July 19, 1971.

David L. Freeman, C. Thomas Wyche,
and William W. Kehl, of Wyche, Burgess,
Freeman & Parham, Greenville, S. C., for
plaintiffs.

Andrew B. Marion, of Haynsworth,
Perry, Bryant, Marion & Johnstone,
Greenville, S. C., for defendant Atlantic
Services, Inc.

Ernest J. Howard, Greenville, S. C.,
for defendant Flora Mir Candy Corporation and Flora Mir Distributing Co., Inc.

W. C. Boyd, H. Simmons Tate, Jr., and
J. Donald Dial, Jr., of Boyd, Bruton,
Knowlton & Tate, Columbia, S. C., for
defendant Keebler Co.

J. Wright Horton, of Rainey, Fant &
Horton, Greenville, S. C., for defendant
Meadors, Inc.

## ORDER

HEMPHILL, District Judge.

The plaintiffs are holders of subordinated debentures of Meadors, Inc.
(Meadors), a Delaware corporation
having its principal place of business in
Greenville, South Carolina, where it was,
until November, 1968, engaged in the
business of manufacturing candy. The
action is brought by the plaintiffs on
behalf of themselves and other debenture
holders whose debentures in the aggregate total $330,000.00 in principal
amount.

Before making specific findings of
fact a preliminary statement covering
some of the background and undisputed
matters in this complex litigation will be
made.

In 1963 United Biscuit Company of America, later named Keebler Company (Keebler) purchased all of the outstanding stock in Meadors, Inc., from a group of stockholders who, as a part of the transaction, exchanged convertible debentures of Meadors for the debentures now in question. Keebler had an established organization for the sale and distribution of food products, including a sales force for the handling of candies manufactured by Meadors. On acquisition of the Meadors stock the Meadors sales force was dismantled and its output was sold by the Keebler sales organization under the Keebler label.

In February, 1968, Keebler entered into an agreement to sell the stock of Meadors to Atlantic Services, Inc. (Atlantic), for $230,000.00. By means hereinafter set forth Atlantic paid Keebler the purchase price with funds withdrawn from Meadors.

Atlantic also withdrew at that time an additional $80,000.00 from the Meadors bank account, making a total of $310,-000.00 drawn from the Meadors account at the time of the closing on February 19, 1968.

Four months later, on June 25, 1968, Atlantic sold the Meadors stock to another corporation, Flora Mir Distributing Co., Inc., an inactive subsidiary of Flora Mir Candy Corporation; this subsidiary had insignificant assets. The consideration for this sale was $352,141.00, of which $293,800.00 was paid at the closing. $58,341.00 was to be paid upon collection by Meadors of accounts receivable in this amount. Both the initial payment and the remaining balance was paid to Atlantic by Flora Mir with funds withdrawn from Meadors. The net effect of the two sales from the standpoint of Meadors and its creditors was that Meadors' cash, which made up more than half of its assets, had undergone metamorphosis becoming an uncollectible account receivable. In November, 1968, Flora Mir arranged to terminate Meadors' operations in South Carolina and was in the process of removing Meadors' property to Dunn, North Carolina, where Flora Mir had other subsidiaries, when halted by an attachment for unpaid rent by the landlord of Meadors in Greenville. Meadors' operations ended completely on November 15, 1968. This action was commenced in November, 1968, and an order was entered at the same time restraining Meadors from removing any of its property from South Carolina.

On May 12, 1969, Flora Mir Candy Corporation, Flora Mir Distributing Co., Inc., Meadors, Inc. and 10 wholly-owned subsidiaries of Flora Mir Candy Corporation filed petitions for arrangements under Chapter XI of the Bankruptcy Act in the District Court for the Southern District of New York. On the same day these companies moved for an order consolidating the proceedings of the 13 debtors. The Meadors debenture holders opposed consolidation before the Referee in Bankruptcy unsuccessfully. The order of the Referee was reversed by the United States District Court, however, and on appeal to the United States Court of Appeals for the Second Circuit the order of the District Court was affirmed, that is, Meadors' proceedings were not and are not involved in the Flora Mir bankruptcy proceedings. See Flora Mir Candy Corporation, etc. v. R. S. Dickson and Company, etc., Second Circuit, 432 F.2d 1060, decided October 28, 1970. As a result of the decision in the Second Circuit, such recovery as is had in this action will be for the benefit of Meadors and its creditors alone, rather than the consolidated companies and their creditors.

The prosecution of this action to final judgment was authorized by the Bankruptcy Court by order dated August 28, 1969. In the trial of this action, the court deemed it proper (and counsel for all parties agreed) to separate the determination of the issues of liability from the question of damages, particularly in view of the unsettled questions involved in the then pending appeal to the Second Circuit, which was not decided until after the trial commenced on October 26, 1969. Thus this order

makes a final determination of questions of liability only. Damages will be determined at a later trial in accordance with the determinations of liability made herein.

Several claims for relief are set forth in the Complaint in this action. They are properly combined under Rule 18 (b) of the Federal Rules of Civil Procedure. In addition, the defendant Keebler has cross-claimed against the defendant Atlantic under an agreement of indemnity embodied in the agreement of sale of the Meadors stock to Atlantic. A similar indemnity agreement was entered into in the transaction between Atlantic and Flora Mir Distributing Company. This is likewise set up in a cross-claim by Atlantic against Flora Mir Candy Company and Flora Mir Distributing Company. These agreements also contained guarantees of the debentures in question by Atlantic and Flora Mir Distributing Company.

Decision of most issues raised by the indemnity agreements and guarantees may be rendered summarily at this point.

Atlantic under its indemnity agreement is clearly obligated to Keebler for all amounts Keebler is compelled to pay as a result of this action, and in turn Flora Mir Distributing Company is obligated to Atlantic under its indemnity agreement for any amounts Atlantic is obliged to pay as a result of either the claims for relief by the plaintiffs or the cross-claim by Keebler.

There is no question but that the debentures are in default and that Meadors owes the full principal amount thereof, the sum of $330,000.00 plus interest at the rate of seven (7%) percent per annum from the 2nd day of January, 1968. The plaintiffs are entitled to judgment against Meadors for the amounts due under such debentures. Atlantic and Flora Mir Distributing Co., Inc., are likewise obligated to the plaintiffs under their respective guarantees. The primary obligation, however, lies on Meadors, and whether this primary obligation can be discharged would appear to depend on the liability of the defendants Atlantic and Keebler to Meadors. Thus it must first be determined whether the defendants Atlantic and Keebler are responsible to Meadors, and if so under what principles of liability.

In the Complaint, allegations are made which would support recovery by Meadors against the defendants on any one of three theories:

a. Conspiracy.

b. Breach of Fiduciary Duty.

c. Breach of the Trust Fund Doctrine.

It is of course proper for the plaintiff under the Federal Rules to assert alternative theories of recovery, and the plaintiffs are entitled to recover if they establish a claim for relief. An examination of the principles of law applicable in this case will be undertaken after making specific findings of fact.

Preceding the trial of this action, extensive discovery was undertaken by the plaintiffs. All depositions taken were introduced in evidence by the plaintiffs. These included depositions from Vincek, Stange and Burchsteed of Keebler; Ezrine, Pardes and Weiner of Atlantic and, among others, Koegel of Flora Mir. Of these, only Stange, Weiner and Koegel testified at the trial. Vincek and Burchsted were present but did not testify.

The following findings of fact are based upon the testimony taken before me and the depositions offered at the trial.

## FINDINGS OF FACT

1. Diversity of citizenship exists between the parties plaintiff and defendants; the amount in controversy exceeds the sum of $10,000.00; and all defendants have been duly served and are properly before the court.

2. On or about August 7, 1963 the defendant, Keebler (then named United Biscuit Company of America) bought all the shares of the common stock of Meadors for a total cash consideration of

$187,000.00 from twenty-eight shareholders, most of whom were then also holders of debentures issued by Meadors. As a part of the transaction, the selling shareholders exchanged $330,000.00 of the seven (7%) percent convertible subordinated debentures of Meadors for the seven (7%) percent subordinated debentures, which are now held by plaintiffs in the present action.

3. At the time of its acquisition by Keebler, Meadors was in serious financial trouble. Its balance sheet then showed a net deficit of $174,000.00. Therefore the debentures had book value of less than 50 cents on the dollar.

4. Meadors was operated by Keebler as a wholly owned subsidiary from its acquisition by Keebler until the sale to Atlantic Services in February 1968. During the later years of that period, Meadors made substantial book profits so that by February Meadors showed a net worth of approximately $230,000.00.[1] Its total assets on February 19, 1968, were $581,491.00. Cash accounted for $321,337.00 of those assets.

5. The result of which plaintiffs complain was accomplished by two transactions which, without many pertinent details were as follows. On February 19, 1968 Keebler sold all of the stock in Meadors to Atlantic for a cash price of $230,000.00. The $230,000.00 paid Keebler was Meadors' money and that amount, together with a withdrawal by Atlantic Services from Meadors' account, were shown as a receivable by Meadors from Atlantic Services. On June 25, 1968, Atlantic Services sold all shares of Meadors to Flora Mir Distributing Company, a Flora Mir Candy Company subsidiary with negligible assets, for $352,000.00. By the means hereinafter set forth, Atlantic Services paid its account to Meadors and Flora Mir Distributing Company paid Atlantic Services the purchase price by utilizing all Meadors' liquid assets. This advance from Meadors to Flora Mir was reflected as an account payable to Meadors from Flora Mir Distributing. At that point, discounting commissions that may have been paid, Keebler had $230,000.00; Atlantic Services had $122,000.00 net and Meadors to whom the plaintiff creditors looked had a $352,000.00 account receivable from a corporation with no assets. It is no wonder that Meadors' creditors are distressed.

6. Sometime prior to the first of the transaction mentioned above, Keebler had determined to get out of the candy manufacturing business. In accordance with that decision it had been seeking a buyer for Meadors. Negotiations with Flora Mir Candy Company had progressed almost to a closing when Atlantic Services came into the picture. In fact, Mr. Koegel, Flora Mir's president, had with him, at his meeting with Keebler personnel on February 14, a check in the amount of $176,000 the purchase price that had been agreed upon. That closing did not take place because of Atlantic's willingness, expressed on that date, to purchase Meadors at a higher price.

7. Mr. Olen, a broker representing Atlantic, met with Mr. Burchsteed, a Keebler officer and president of Meadors, in the morning of February 14, 1964. As a result of their conference, the impending sale of Meadors to Flora Mir was delayed and a conference was arranged between Keebler and Atlantic Services for that afternoon in the offices of White and Case, Keebler's counsel. At that meeting agreement was reached for the sale of Meadors to Atlantic along the lines of the tentative agreement with Flora Mir. The principal difference was

---

1. It should be noted that the record does not disclose whether or how much real profit Meadors realized from its manufacture of candy. When acquired by Keebler, Meadors had substantial accumulated loss ($400,000) to carry forward. It appears from the deposition and testimony of Mr. Stange that Keebler allocated to Meadors profitable operations other than manufacturing to utilize that accumulated loss for tax purposes. That factor, together with the fact that Meadors had no market for its product, would indicate Meadors was of very questionable value as a going business in spite of the recent profit it showed on its books.

that the price was $235,000.00 and a decrease in the amount of candy Keebler was to purchase from Meadors. Upon preparation of the documents, Keebler and Atlantic Services executed the contract either late on the 14th or on the following day.

8. An attorney named Ezrine, who Keebler understood to be an officer of Atlantic Services negotiated for Atlantic Services. He represented to Keebler that Atlantic Services was a prospering small conglomerate that wanted to get into the candy business as a part of its expansion. It was clear that neither he nor anyone at Atlantic Services had any experience in the industry. He presented for Keebler's examination an unaudited financial statement showing that Atlantic Services had a net worth of $997,-000.00 as of December 31, 1967, and had had net income of $158,588.00 for the calendar year 1967. Inspection of the statement would have revealed that Atlantic Services had only one operating company and that good accounting practices might have required a lower evaluation of some assets. The agreement between Atlantic Services and Keebler required that an audited statement of Atlantic be provided Keebler. The audited statement given Keebler in August 1968, pursuant to that requirement, reflected an increased net worth for Atlantic Services. It would appear that Atlantic was, at the time of the transaction with Keebler, able to satisfy the account in favor of Meadors, though Atlantic did not intend to do so.

9. Subsequent to the execution of the contract for the sale of Meadors to Atlantic Services, Keebler requested a Dun and Bradstreet report on Atlantic Services. Dun and Bradstreet's response was that it showed P.A.C.O. at the address given by Atlantic Services. P.A.C.O. was an Atlantic Services subsidiary and Keebler seems to have made no further investigation of Atlantic Services.

10. Ezrine, on two occasions, the conference on the 14th and by telephone on the 16th, inquired of Mr. Vincek of Keebler, about the possibility of using Meadors' money to finance the purchase. Vincek replied to the effect Meadors' money could not be used. He made no inquiry of Atlantic Services as to the contemplated source of its funds, taking the position that it was none of his business and further that "as far as I was concerned, it was going to be a regular purchase and sale of those shares and no different than any other transaction that anybody reaches at arm's length—which it was."

11. Circumstances surrounding the transaction known to Keebler at the time of its sale of Meadors which might have indicated that Atlantic Services had no intention of operating Meadors were: (1) No one from Atlantic Services had any experience in the candy business; (2) At the time of the execution of the contract no one from the purchaser had inspected the Meadors operation: (3) At the time of the closing, only Atlantic Services' accountant had examined Meadors to any appreciable extent and he was interested principally in the books and inventory: (4) Meadors had no market of its own and the profit as shown could not have been accepted at face value by an outsider: (5) Prior to the closing, the purchaser had conducted no negotiations with key employees then operating Meadors relative to the continuation of the business.

12. Those factors, while not necessarily inconsistent with a legitimate sale of a business the size of Meadors, when coupled with dispatch with which the sale was consummated and the inquiry by the purchaser as to the availability of Meadors' funds for payment of the purchase price, were more than sufficient to arouse the suspicion of Keebler.

13. The court finds that Atlantic Services never intended to continue the operations of Meadors, but its intention from the outset was to utilize Meadors funds. In the four months or so that Atlantic Services owned Meadors, there was little or no effort made by Atlantic Services to insure continued operation of

Meadors. The contract with Keebler, which provided Meadors only sales and income, was accelerated, resulting in increased cost of production to Meadors. Not only was Meadors' profit from the Keebler contract thereby reduced, but also the time in which to find new markets was reduced. Atlantic Services made no attempt to alter or improve Meadors' methods or production. It hired no new people to assist in either production or sales. Its discussions with management inherited from Keebler appear to have been largely restricted to disputes regarding operating funds. Atlantic Services offered the testimony of only one witness at the trial, its accountant, Mr. Weiner. His testimony was not at all convincing and inasmuch as it was inconsistent with the facts or implications set forth above, or for that matter hereinafter, it should not be given credence.

There may be legitimate business reasons for the acquisition of a company such as Meadors, which reasons do not require the continued operation of the company. This court concedes its naivety in matters of corporate finance and acquisition. However, Atlantic Services has offered no explanation for its acquisition of Meadors other than its hope for profitable production by that company. That explanation is totally inconsistent with its conduct. Faced with the absence of any credible explanation for Atlantic's acquisition and by the position of Meadors upon its sale by Atlantic (i. e. a large account receivable from a judgment proof creditor), the court cannot escape the conclusion that Atlantic acquired Meadors for the purpose of looting it and ultimately accomplished that purpose.

14. The closing by which Atlantic acquired Meadors' stock from Keebler took place in the Peoples National Bank in Greenville, South Carolina, on February 19, 1969. Immediately prior to that closing, Meadors had $321,000 in its checking account in that bank. When the parties to the closing met at the bank, Mr. Pardes, an officer of Atlantic, opened an account for Atlantic Servies in Peoples Bank. Peoples Bank then made a one-day loan to Atlantic Services in the amount of $235,000.00 with the understanding that the loan was to be repaid from Meadors' funds before Mr. Pardes left the bank. The bank required no collateral for the loan because its officer knew that Atlantic was purchasing Meadors and that the loan would be repaid with Meadors' funds on deposit there. Atlantic deposited the borrowed $235,000.00 in its new account and wrote its check to Keebler for $230,-000.00, the purchase price. The transfer of the stock was accomplished, and Mr. Pardees, for Atlantic, at that point owner of Meadors, wrote two checks on Meadors payable to Atlantic, one for $230,000.00 and a second for $80,000.00, which checks were deposited to the Atlantic account. He then wrote Atlantic's check to the bank to pay the $235,000.00 loan. No representative of Keebler was present during Pardes' dealings with the bank.

15. The sale of Meadors to Flora Mir Distributing Company took place in the Royal National Bank in New York where Atlantic Services had made the arrangements. On that day, Meadors, Flora Mir Distributing and Atlantic had or opened accounts in Royal Bank. Royal National Bank made a one-day loan to Atlantic in the amount of $276,000.00, the amount then due Meadors from Atlantic. As the court understands the rest of the transaction, Atlantic loaned Flora Mir Distributing the $276,000.00. Flora Mir Distributing then paid Atlantic the $276,-000.00 as the purchase price for Meadors. Atlantic then paid Meadors the $276,000.00 to settle its account. Flora Mir Distributing then withdrew the $276,000.00 from Meadors, together with $17,000.00 other Meadors money, repaid the Atlantic loan and applied the $17,-000.00 to the balance due Atlantic on the purchase price. Atlantic then repaid the bank.

Agents of Atlantic knew that Flora Mir Distributing was a corporation with negligible assets. It was they who devised the scheme set forth above for

the handling of the transaction. As far as Mr. Koegel, President of Flora Mir-Candy and Flora Mir Distributing was concerned, it was merely a question of taking over the company free. He hoped to operate Meadors and make money on it. As the corporation which assumed the liabilities to Meadors and Meadors' liabilities had negligible worth, he felt that he had everything to gain and nothing to lose by acquiring Meadors.

15. Flora Mir Distributing was an inactive wholly owned subsidiary of Flora Mir Candy Company. At the time of the organization of Flora Mir Distributing, it had conducted certain business functions but at the date of its acquisition of Meadors, those functions had been discontinued or were being otherwise conducted. At the time of its acquisition of Meadors, it had negligible assets and no active officers and directors to maintain its separate identity from Flora Mir Candy, its parent corporation.

## CONCLUSIONS OF LAW

I. In presentation of their case and in argument, plaintiffs place their principal reliance upon the theory that the owners of a controlling interest in a corporation owe a fiduciary duty to that corporation's creditors as well as stockholders. That duty prohibits the use of the corporate power and control for the advantage of the owner of the controlling interest at the expense of the other stockholders and creditors. No matter that the controlling shareholder may have that power, it is subject to the equitable limitation that it may not be used for the benefit of the fiduciary at the expense of the "community of interests in the corporation—creditors as well as stockholders." Pepper v. Litton, 308 U.S. 295, 307, 60 S.Ct. 238, 245, 84 L.Ed.2d 281 (1939). Like the *Litton* case, most cases discussing the duty owed the corporation, creditors, and stockholders are on facts where an officer or director has used his position as an insider to avail himself of a corporate opportunity or to gain a preference over competing creditors.

The general rule is that shares of corporate stock are property and may be disposed of as the owner sees fit. Yet there appears to be an exception to that rule under certain circumstances. Plaintiffs urge that the facts surrounding the sale by Keebler to Atlantic constitute those circumstances.

Relatively little authority has been found by the parties defining the duty to the community of corporate interests in the context of the sale of the control of the corporation to an outsider. In that situation, the law must accommodate two interests, that of free transfer of the ownership of the corporate entity and that of providing protection for all parties with investment in, or accounts with, the corporation. One finds the difficulty described by Professor Cavitch in the section of his treatise on corporate law dealing with the question generally as follows:

This is an area of corporate law particularly cursed with many shadowy lines and uncertainty born primarily from the need of judicial accommodation of what appear to be diametrically opposed interests. 6 Cavitch, Business Organizations § 120.03 page 751.

The subsection which considered the specific problem here confronting the court began:

The process of balancing opposing propositions reaches its apex of delicacy when the central transaction is a sale by the controlling stockholder of his shares. 6 Cavitch, Business Organizations, § 120.03 [3] page 756.

Plaintiffs rely principally upon the case of Insuranshares Corporation v. Northern Fiscal Corporation, 35 F.Supp. 22 (E.D.Pa.1940). In that case, as had defendant Keebler in this case, defendants had sold controlling interest in a corporation to a group which had looted the corporation with dispatch. The court defined the duty of the seller as follows:

The law has long ago reached the point where it is recognized that such persons may not be wholly oblivious of the interests of everyone but them-

selves, even in the act of parting with control, and that, under certain circumstances, they may be held liable for whatever injury to the corporation made possible by the transfer. Without attempting any general definition, and stating the duty in minimum terms as applicable to the facts of this case, it may be said that the owners of control are under a duty not to transfer it to outsiders if the circumstances surrounding the proposed transfer are such as to awaken suspicion and put a prudent man on his guard—unless a reasonably adequate investigation discloses such facts as would convince a reasonable person that no fraud is intended or likely to result. Thus, whatever the extent of the primary duty may be, circumstances may be sufficient to call into being the duty of active vigilance and inquiry.

Keebler, although contending that its conduct complied with the requirements of the *Insuranshares* case, because there were not sufficient circumstances to put it on notice that there was anything amiss in Atlantic's intentions, urges that the *Insuranshares* case does not state the correct law. Keebler argues that it must have had knowledge of the intended looting to be held liable therefor. In that argument Keebler relies principally upon the case of Levy v. American Beverage Corporation, 265 App.Div. 208, 38 N.Y.S. 2d 517 (1942) where the lower court which had given judgment for plaintiff relying on *Insuranshares* was reversed. The New York Court stated:

> To apply the rigid rules limiting a fiduciary and to say further that the failure to investigate the moral character, or financial ability of the purchaser of one's stock is an actionable wrong, is to place an unwarranted burden upon the ownership of stock. Knowledge that purchasers were about to loot the corporate treasury, or were

persons who had previously engaged in such practices would be one thing. Concluding on the basis of mere lack of knowledge concerning the business integrity of the purchaser that the seller assumes the risk that the buyer has an intention to loot the company would be quite another. The law does not require one to act on the assumption that a person with whom a business transaction, even of a large amount, is had, will commit a fraudulent or criminal act if given the opportunity to do so. Quite the contrary may be assumed, in the absence of actual notice. 38 N.Y.S.2d at p. 526.[2]

This court recognizes that the vitality of Keebler's argument flows from the law's policy favoring a free market for goods and businesses. As this court understands the *Insuranshares* standard, its imposition would not unduly encumber a free market or " 'freeze out' small businessmen and others who could not furnish guilt-edged credentials to sellers from whom they are seeking to but an investment." (Keebler brief.) The court agrees with Judge Friendly that: "To hold the seller for delinquencies of the new directors only if he knew the purchaser was an intending looter is not a sufficient sanction."[3] To require knowledge of the intended looting on the part of the seller in order to impose liability on him places a premium on the "head in the sand" approach to corporate sales, the unfortunate consequences of which approach are demonstrated herein. The standard recognized in the *Insuranshares* case has been stated as follows: " * * * [W]hen transferring control of the corporation, the managing majority are duty-bound not to sell controlling interest to outsiders if the circumstances surrounding the proposed transfers would alert suspicion in a prudent man that the purchasers

2. The court assumes that South Carolina law applies, at least to the determination of the liability of Keebler. Counsel have not argued the point, but the sale by Keebler of the South Carolina corporation took place in South Carolina. Regretably

the case appears to be one of first impression in that jurisdiction.

3. Essex Universal Corporation v. Yates, 305 F.2d 572, 581, concurring opinion (10th Cir. 1962).

are an irresponsible group who will mismanage and loot the corporate assets." McDaniel v. Painter, 418 F.2d 545, 547 (10th Cir. 1969). That statement would not appear to impose a duty to investigate the prospective purchaser unless suspicious circumstances are known to the seller. However, if such circumstances do appear, the seller would be required to conduct such investigation or extract such explanation as would satisfy a reasonable man that the prospective owners do not intend to mishandle the corporate assets.

■ Judge Clark, concurring in Essex Universal Corporation v. Gates, 305 F.2d 572, 579 (10th Cir. 1962), expressed concern springing from the courts "lack of knowledge of corporate realities and the current standards of business morality * * *." This court shares that concern, but is of the opinion that the controlling seller must be held to at least the standard of care as set forth above. The requirement of actual knowledge of the intended looting, necessarily eliminating any standard of care, would, by sanctioning the reckless or irresponsible sale of corporate control, commend persons having non-controlling interests in the corporation to the mercy of the holder of the controlling interest. The court is of the opinion that such situation would create as substantial impediment to corporate operations and finance as the recognition of a duty to use due care in making a sale of a controlling interest. Thus, the court concludes that Keebler, in selling Meadors' stock, was bound to exercise due care, in light of the circumstances known to it at the time of the sale, to prevent the acquisition of the stock and control by any who would loot the corporate assets.

■ The court is of the opinion that the circumstances set forth in the findings of fact were sufficiently suspicious to require that Keebler refrain from selling Meadors to Atlantic Services. The court does not know what reasonable investigation by Keebler prior to and at the time of the sale would have revealed. It would surely have shown that Meadors' money was being utilized for payment of the purchase price. It might have revealed unsavory incidents in the past dealings of the broker and the attorney for Atlantic Services. Keebler, however, attempted no investigation other than one inquiry of Dun and Bradstreet, the response to which inquiry provided no information. Had it investigated and been deceived there would be a different question. (*Insuranshares*, supra). It may be that the Keebler failure to conduct reasonable investigation of the purchaser was not a *sine qua non* to plaintiff's damage. However, there is no question but that the sale itself was such cause. In light of all the circumstances known to Keebler, it was required either to conduct such investigation of the purchaser as would convince a reasonable man that the sale was legitimate, or to refrain from making the sale. Keebler conducted no investigation and sold the stock under circumstances which indicate that something was amiss. Keebler is therefore liable to Meadors for the benefit of plaintiffs, or to plaintiffs, for such damages as may subsequently be proven to have inured to plaintiffs from the looting accomplished by Atlantic.[4]

4. Keebler points out that in each case imposing liability upon the seller of control of a corporation a premium was paid such seller for his stock. The payment of such premium has not been proven in this case, though for the reasons set forth in the findings of fact, it would be difficult to determine the market value of Meadors. There are two types of cases sometimes overlapping in which the seller of control has been held liable. In the first type, represented by Commonwealth Title Insurance & Trust Co. v. Seltzer, 227 Pa. 410, 76 A. 77 (1910), the payment of a premium is a necessary element, the theory being that the premium was payment for a corporate opportunity or asset in which all shareholders were entitled to share. In the second type represented by *Insuranshares*, the basis for recovery is the negligence of the seller. Therefore, while the payment of the premium may constitute such circumstance as should put the seller on notice, if there are other such suspicious circumstances, the lack of a premium cannot exonerate the seller.

II. From the facts found by the court, the court concludes that Atlantic looted Meadors. Atlantic is therefore liable to Meadors or plaintiffs for their damage resulting from that looting. Atlantic will also be liable to Keebler for any amounts Keebler may be forced to pay as a result of this action, the basis of that liability having been set forth hereinbefore.

III. As stated above, Flora Mir Distributing is liable to Atlantic for any amounts Atlantic may be required to pay for the satisfaction of the debentures as a consequence of its indemnity agreement. Atlantic argues that, because Flora Mir Distributing was a shell without resources of its own, Flora Mir Candy is also responsible for that obligation. The court does not agree. Atlantic knew with whom it was dealing and that Flora Mir Distributing had no assets. Atlantic also knew that it was that very fact and Koegel's belief that it effectively limited Flora Mir Candy's obligation that made the proposition attractive to Koegel. Therefore, Atlantic is now in no postition to ask the court to disregard the corporate identity of Flora Mir Distributing. It should get what it bargained for, indemnity from Flora Mir Distributing, and nothing more.

IV. Flora Mir Distributing admits its liability to Meadors and to Atlantic.

V. It appears that Flora Mir Candy, because Flora Mir Distributing was not an active corporation but rather alter ego of Flora Mir Candy, is likewise liable to Meadors for the same amounts Flora Mir Distributing is liable.

VI. As pointed out above, the determination of the amount of the damages has been reserved for later hearing. Considerable problem is present at this juncture, because of the cross liabilities of the defendants, the standing of the plaintiffs, and the ownership of Meadors by Flora Mir Distributing, as to the proper procedure in allocating the damages to Meadors or the individual plaintiffs who are the principal, but subordinated, creditors of Meadors. The court concludes that Keebler, Atlantic Services, Flora Mir Distributing are jointly and severally liable for the roles they played in the looting of Meadors. And Flora Mir Candy Company is liable for the accounts owed Meadors by Flora Mir Distributing. However, it is not clear whether as a practical or legal matter that liability is to Meadors or the debenture holders. The court thinks the question, because of the indemnity agreements, is largely academic and can be resolved, or will resolve itself, if the determination of liability made herein is correct. Therefore, the court merely notes that the judgment, when the amount of damages has been determined, will take such form as is necessary to make the debenture holders whole.

The court is of the opinion that this order involves controlling questions of law as to which there are substantial grounds for differences of opinion and that an immediate appeal from this order may materially advance ultimate termination of this litigation.

And it is so ordered.