John G. **SWINNEY** and R. S. Dickson and Company, a North Carolina Corporation, on behalf of themselves and all others similarly situated, Appellees,

v.

**KEEBLER COMPANY**, Appellant.

John G. **SWINNEY** and R. S. Dickson and Company, a North Carolina Corporation, on behalf of themselves and all others similarly situated, Appellees,

v.

**FLORA MIR CANDY CORPORA- TION et al.**, Appellants.

Nos. 72–1968, 72–1969.

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1973.

Decided June 26, 1973.

John M. Johnston, New York City (White & Case, Thomas Jefferson O'Sullivan, III, Vincent R. Fitzpatrick, Jr., New York City, H. Simmons Tate, Jr., J. Donald Dial, Jr., Boyd, Bruton, Knowlton, Tate & Finlay, Columbia, S. C., on brief) for appellants.

David L. Freeman and C. T. Wyche; Greenville, S. C. (William W. Kehl, Wyche, Burgess, Freeman & Parham, P. A., Greenville, S. C., Russell M. Robinson, II, and Fleming, Robinson & Bradshaw, P. A., Charlotte, N. C., on brief) for appellees.

Before WINTER, FIELD and WIDENER, Circuit Judges.

WINTER, Circuit Judge:

Plaintiffs, two holders of a part of the defaulted $330,000, principal amount, seven percent subordinated debentures of Meadors, Inc. (Meadors), instituted this action for themselves and all other similarly situated Meadors' debenture holders. The object of the suit was to obtain payment of the debentures or damages equal to the amounts unpaid. They named as defendants Meadors, the issuer of the debentures, and various companies, including the parent of one, which successively had owned the stock of Meadors for the period August 7, 1963 to July 15, 1968, the date of suit,

viz: (a) Keebler Company (Keebler), formerly United Biscuit Company of America, owner from August 7, 1963 to February 19, 1968; (b) Atlantic Services, Inc. (Atlantic), owner from February 19, 1968 to June 25, 1968; (c) Flora Mir Distributing Co., Inc. (Flora Mir Distributing), owner from June 25, 1968 to the date of suit; and (d) Flora Mir Candy Corporation (Flora Mir Candy), the parent corporation of Flora Mir Distributing. In a bifurcated trial, the district court, in essence, held all defendants liable to plaintiffs and assessed damages at $533,175, representing the principal amount of the debentures, interest through April 2, 1972, attorneys' fees and expenses.[1] To be exact, the district court rendered judgment in that amount against all defendants, except Meadors, for the benefit of Meadors and directed that any amounts paid in Meadors' judgment be paid into court and then disbursed in payment of plaintiffs' claims and expenses. Keebler has appealed on both the issues of its liability and the proper measure of damages, including attorneys' fees.

Since Keebler is the only defendant who has appealed, we will confine our consideration to the case against it. The district court found that, in connection with the successive sales of Meadors' stock from Keebler to Atlantic to Flora Mir Distributing, Meadors had been looted by Atlantic and its corporate assets dissipated, with the result, among others, that the interest and principal of the debentures were in default. Although the district court made no finding that Keebler had looted Meadors and, indeed, made no finding of any intentional wrongdoing on the part of Keebler, it nevertheless held Keebler liable for violation of its obligation to Meadors and Meadors' debenture holders "[i]n light of all the circumstances known to Keebler . . . to conduct such investigation of the purchaser [At-

---

1. All defendants, except Keebler, are the subject of Chapter XI bankruptcy proceedings in the Southern District of New York. This fact may explain why only Keebler has appealed. This fact does explain why plaintiffs are vigorous in their attempt to uphold their judgment against Keebler.

lantic] as would convince a reasonable man that the sale was legitimate, or to refrain from making the sale." Swinney v. Keebler Company, 329 F.Supp. 216, 224 (D.S.C.1971).

We disagree that the circumstances were such as to give rise to an obligation on the part of Keebler to conduct an investigation of Atlantic beyond that which was actually conducted or to refrain from making the sale. Accordingly, we reverse and direct the entry of judgment for Keebler.

## I.

The district court's extensive findings of fact are not challenged as clearly erroneous. Only the legal conclusions to be drawn from them are attacked. An extended factual recitation is therefore unnecessary.

Briefly stated, Keebler bought the stock of Meadors, a candy manufacturer, on August 7, 1963. At the time of the purchase, Meadors was in serious financial trouble and its debentures had a book value of less than one-half of their principal amount. Keebler operated Meadors, manufacturing and distributing candy and causing it to engage in other profitable operations so as to utilize a substantial tax loss carryback. By February, 1968, Meadors had total assets of $581,491, including cash of $321,337, and a net worth of $230,000.[2]

Prior to February, 1968, Keebler decided to withdraw from the manufacturer of candy, but not its sale and distribution, and it concluded to sell Meadors. It employed a broker to find a buyer and subsequently began negotiations with Flora Mir Candy.

Negotiations with Flora Mir Candy proceeded to the point where the buyer was preparing to purchase Meadors for $176,000, although not all aspects of the transaction had been agreed upon, when on February 9, 1968, a Keebler officer, Mr. Chester Burchsted, received a telephone call from a broker, Mr. Olen, who indicated that Atlantic might be interested in purchasing Meadors. Burchsted agreed to meet Olen in the Newark airport on February 14, 1968, the same day that Burchsted was scheduled to be in New York to continue negotiations with Flora Mir Candy.

Burchsted and Olen met in the Newark airport on the morning of February 14, 1968, and as a result of the meeting an afternoon session was arranged in New York at the offices of Keebler's lawyers between Altantic's counsel, Ivan Ezrine, Esquire, and several representatives of Keebler, including Edward Vincek, Esquire, Keebler's general counsel. In the meantime, Keebler's negotiations with Flora Mir Candy were suspended.

During the afternoon meeting, Keebler's various representatives questioned Ezrine concerning Atlantic, its financing structure and its corporate and financial history.[3] Ezrine told Keebler that Atlantic was a prospering small holding company which was becoming a conglomerate and wanted to diversify by expanding into the candy business. Ezrine gave Keebler recent unaudited financial statements, prepared by certified public accountants, which showed that Atlantic had a net worth of $997,000 as of December 31, 1967, and net income of $158,588 for that calendar year.[4]

---

2. These figures were before any charge for management service provided by Keebler or any allocation to Meadors of any portion of Keebler's overhead.

3. Prior to this meeting, Burchsted requested a Dun and Bradstreet report on Atlantic. He received an oral report that a company named Paco was at the address given as Atlantic's offices. In later discussions, Burchsted was advised

by representatives of Atlantic that Paco was one of its subsidiaries.

4. The Keebler-Atlantic agreement subsequently executed required that Atlantic provide Keebler with audited statements. These were delivered in August, 1968, and as found by the district court, they "reflected an increased net worth for Atlantic . . . ." They showed a net worth of $1,249,472 and earnings of $259,604.

At the February 14 meeting, Keebler and Atlantic negotiated an agreement for the sale of Meadors' stock, and the agreement was executed that day or the next. The contract documents were patterned largely on those which had been prepared while the negotiations with Flora Mir Candy were continuing. Among other things, the following agreements were reached: (1) the sales price was set at $235,000, (2) Atlantic represented its financial statement of December 31, 1967 as true, correct, and prepared in accordance with generally accepted accounting principles, (3) Atlantic promised, as a condition of the sale, that its financial strength on the closing date would be substantially the same or better than shown in its December 31, 1967 statements, (4) Atlantic agreed to guarantee Meadors' accounts payable and accruals, (5) Atlantic agreed to guarantee payment of the interest and principal of the Meadors' seven percent subordinated debentures, and (6) Atlantic agreed to indemnify Keebler from any liability arising out of the sale.

Keebler, for its part, warranted as true and correct its representations including the Meadors' balance sheet, the list of outstanding contracts and the list of Meadors' tangible properties. Keebler promised to use its best efforts to retain Meadors' personnel except officers and directors who were Keebler's nominees, and it agreed to purchase $562,000 worth of candy from Meadors within the ensuing nine-month period.

The closing was held in Greenville, South Carolina, on February 19. Prior thereto, Atlantic sent its certified public accountant to the Meadors' plant twice to inspect it. The accountant found a minor discrepancy in the properties of Meadors and the parties agreed to a $5,000 reduction in the ultimate purchase price paid by Atlantic on that account. Once at the negotiating session and once prior to the closing, Ezrine inquired of Vincek as to the possibility of making some arrangement to avoid Atlantic's bringing the funds for consummation of the transaction from New York. Both times Vincek rejected the suggestion and advised Ezrine that it was Atlantic's responsibility to finance the purchase.

At the closing, various documents were executed and delivered, including a licensing agreement which permitted Meadors to use Keebler's "Kitchen Rich" trademark under which Meadors' candy had been sold, and a detailed bill of sale conveying to Meadors all machinery and equipment theretofore on lease from Keebler. Although there was no evidence to show that Keebler was aware of what had transpired, Atlantic made a one-day borrowing of $235,000 from the People's National Bank, a bank in Greenville where Meadors had its account. Atlantic deposited the loan proceeds in an account in its name, then bought a $230,000 banker's check drawn on a New York bank in favor of Keebler for the adjusted purchase price. After the closing, Atlantic transferred $310,000 from the Meadors' account to its own account and repaid the loan. The transfer of funds was shown on Meadors' books as a loan to Atlantic—an account receivable—and on Atlantic's books as a loan from Meadors—an account payable.

Keebler had nothing further to do with Meadors after the closing except for the purchase of candy pursuant to the candy contract.

Atlantic retained ownership of Meadors for approximately four months and repaid approximately $33,200 of its loan. During this period, Meadors paid its trade accounts and made a profit of approximately $19,000. Atlantic's efforts to build up an independent sales force and find markets for its candy other than Keebler were largely unsuccessful, and Atlantic then sold the stock to Flora Mir Distributing, a subsidiary of Flora Mir Candy, on June 25, 1968, for a purchase price of $352,000. At that closing, Atlantic's accounts payable to Meadors was repaid; but Flora Mir Distributing, perpetuating the pattern established by Atlantic, thereafter withdrew funds

from Meadors, reflected on Meadors' books as a loan to Flora Mir Distributing. Flora Mir Distributing acquired other candy companies, and Flora Mir Distributing treated itself and its subsidiaries as a single company, transferring monies and properties from one to the other. Initially, the group experienced success with their combined operations, but ultimately the combination became short of working capital and went into bankruptcy.

## II.

The parties do not seriously dispute the applicable law. The district court, correctly, we think, drew upon the leading case of Insuranshares Corporation v. Northern Fiscal Corporation, 35 F.Supp. 22 (E.D.Pa.1940),[5] which held the sellers of a controlling interest in a corporation liable to the corporation when the buyers proceeded to loot it after their acquisition of control. Liability was predicated upon breach of a duty not to transfer control since the circumstances surrounding the transfer were "such as to awaken suspicion and put a prudent man on his guard—unless a reasonably adequate investigation discloses such facts as would convince a reasonable person that no fraud is intended or likely to result." 35 F.Supp. at 25.

In Insuranshares, the suspicious circumstances included (1) the defendants' probable knowledge that the purchase was to be financed by a pledge of the corporation's assets, (2) the corporation's president's clear predisposition to allow a sale to be financed by pledging those assets as security, (3) defendants' awareness of the purchasers' plan to have a large part of the corporation's assets converted into cash prior to the sale, (4) the inflated price or premium paid for control, especially given the nature of the business which was an investment trust with no physical assets but only the ready equivalent of cash in the form of marketable securities, (5) warnings from the sellers' attorneys as to their potential liabilities for dealing with little-known purchasers, and (6) the fact that the corporation had been looted five years before by a different group who had gained control by using the same method of financing.

The standard of conduct to which Insuranshares holds controlling transferors had been widely accepted, Estate of Hooper v. Govt. of Virgin Islands, 427 F.2d 45, 47 (3 Cir. 1969); McDaniel v. Painter, 418 F.2d 545, 547 (10 Cir. 1970); Seagrave Corporation v. Mount, 212 F.2d 389, 395 (6 Cir. 1954); Northway, Inc. v. TSC Industries, Inc., CCH Fed.Sec.L.Rep. ¶ 93,646 (N.D.Ill., Sept. 28, 1972).[6] Generally, the owner of corporate stock may dispose of his shares as he sees fit. Alderman v. Alderman, 178 S.C. 9, 43, 181 S.E.2d 897, 911 (1935). A dominant or majority stockholder does not become a fiduciary for other stockholders merely by owning stock, McDaniel v. Painter, supra. In selling their stock, the stockholders necessarily act for themselves, and not as trustees for the other stockholders. Gerdes v. Reynolds, 28 N.Y.S.2d 662, 650 (Sup.Ct.N.Y.Co., 1941). But majority stockholders who assume the management of the corporation, as Keebler did

---

5. In the instant case, the district court was exercising diversity jurisdiction. While it was cognizant that the law of South Carolina might be the governing law, it found no South Carolina case on point.

6. The district court properly rejected the test applied in Levy v. American Beverage Corp., 265 App.Div. 208, 38 N.Y.S. 2d 517, 526 (1942), to the effect that, before the transferor can be found liable, it must have actual notice that the transferee intends to loot the corporation.

We agree with the district court that "[t]o require knowledge of the intended looting on the part of the seller in order to impose liability on him places a premium on the 'head in the sand' approach to corporate sales," 329 F.Supp. at 223, and with Judge Friendly that "[t]o hold the seller for delinquencies of the new directors only if he knew the purchaser was an intending looter is not a sufficient sanction." Essex Universal Corporation v. Yates, 305 F.2d 572, 581 (2 Cir. 1962) (concurring opinion).

here, can be said to stand in fiduciary relation to the minority under certain circumstances. ( Thus, while the majority is not an absolute insurer against any wrongs which may be done to the corporation after the transfer of control or against any decisions by the new owners that may not be in the best interest of the minority, if the sellers of control are in a position to foresee the likelihood of fraud on the corporation, including its creditors (Pepper v. Litton, 308 U.S. 295, 307, 60 S.Ct. 238, 84 L.Ed. 281 (1939)), or on the remaining stockholders, at the hands of the transferee, their fiduciary duty imposes a positive duty to investigate the motives and reputation of the would-be purchaser;[7] and unless such a reasonable investigation shows that to a reasonable man no fraud is intended or likely to result, the sellers must refrain from the transfer of control.

### III.

In light of the facts and applicable law, plaintiffs' right to recover turns on whether Keebler had sufficient knowledge to foresee the likelihood of fraud so as to give rise to a duty to conduct a further investigation and to satisfy itself, by the test of a reasonable man, that no fraud was intended or likely to result before it consummated the sale of control. The district court identified essentially seven circumstances which "might have indicated [to Keebler] that Atlantic Services had no intention of operating Meadors . . .." 329 F. Supp. at 220. These factors were: (1) no one from Atlantic had any experience in the candy business, (2) at the time the contract was executed no one from Atlantic had inspected the "Meadors operation," (3) by the time of the closing, only Atlantic's accountant had examined Meadors to "any appreciable extent and he was interested principally in the books and inventory," (4) Meadors had no market of its own and the "profit as shown could not have been accepted at face value by an outsider," (5) prior to the closing Atlantic had no negotiations with Meadors' key employees concerning the continuation of the business, (6) the sale was consummated with dispatch, and (7) Atlantic had inquired as to the availability of Meadors' funds for payment of the purchase price. Although the district court concluded that the first five factors were "not necessarily inconsistent with a legitimate sale of a business the size of Meadors," it held that when coupled with facts six and seven, they "were more than sufficient to arouse the suspicion of Keebler." 329 F.Supp. at 220.

■■ We think that the findings of fact relied on by the district court to conclude that Keebler was liable to Meadors' debenture holders were insufficient to support that result.[8] We will comment on them seriatim.

From Keebler's point of view, the fact that no one from Atlantic had any experience in the candy business should not have been suspicious. Atlantic was represented to Keebler as a holding and investment company which did business through subsidiaries. A conglomerate, which Atlantic professed to be aspiring, regularly acquires diverse businesses; and in any event, it is not unusual for

7. *See* 6 Cavitch, Business Organizations § 120.03 [3] [c], pp. 756, 767; 13 Fletcher Cyclopedia of Corporations, § 5805, p. 99 (Perm.Ed. 1970). *See also* Loss, Securities Regulation pp. 1469–70 (1961 Ed.).

8. In a negligence case, when the evidentiary facts are not substantially in dispute, "the ultimate conclusion to be drawn from the basic facts . . . is actually a question of law." Hicks v. United States, 368 F.2d 626, 631 (4 Cir. 1966). This is the rule in this circuit, although it has been criticized in 9 Wright and Miller: Federal Practice and Procedure, § 2590 (1971). We think it applicable here.

any corporation to venture into a new business field. Meadors was an integrated functioning enterprise with management and equipment in place, and Keebler agreed, except with respect to Meadors' officers and directors, which were Keebler personnel, to use its best efforts to maintain intact other personnel of Meadors then on Meadors' payroll. As a result of Keebler's agreement to purchase candy for a nine-month period, Keebler could assume that Meadors would have, at least for the short run, a ready market for candy and an opportunity to recruit and train a sales force.

No suspicion should have been aroused from the fact that no one from Atlantic inspected the Meadors' operation prior to execution of the contract, and that at the time of closing, only Atlantic's accountant had examined Meadors to any appreciable extent. Atlantic's broker, Olen, who first telephoned Keebler's Burchsted, had some familiarity with Meadors, albeit apparently obtained from the broker retained by Keebler. Keebler made extensive warranties concerning the plant and its financial operations and were these warranties untrue, Atlantic might have rescinded the sale or sued for damages. A sufficient inspection prior to closing was made so that the parties agreed to a $5,000 reduction in the purchase price. From Keebler's point of view, Atlantic's reliance on its broker, on Keebler's warranties, and on Atlantic's accountant's inspections was hardly a circumstance indicative of an intention not to operate, much less of an intention to loot.

We see nothing suspicious in the fact that Meadors had no market of its own, and we do not agree that the profit as shown on Meadors' financial statements could not have been accepted at face value by an outsider. While Meadors' past profit history may have been somewhat questionable, its operation by Keebler was profitable, and Keebler warranted Meadors' balance sheet at the time of closing. There is no question but that Keebler's agreement to purchase candy provided Meadors with a substantial initial market, and Keebler could have reasonably assumed that during the period and with the financial support of its purchase of candy, Meadors could build up its own market. Keebler cannot be held liable as a result of its failure to sell Meadors to a company with a candy market already well developed. Only a small portion of the business community could live under such a restrictive rule with regard to the purchase and sale of business enterprises.

Nor do we find significant the fact that prior to closing, Atlantic conducted no negotiations with key employees then operating Meadors relative to their continuation of the business. Keebler contracted to use its best efforts to retain them as employees, and Atlantic did retain them after it took over. The wisdom of Atlantic's failure to negotiate with them prior to closing is not in issue —only its impact on Keebler as a "suspicious circumstance" is significant. Since Keebler owned Meadors, had full power to sell the company, and agreed to do its part in keeping the enterprise intact, we do not think that Keebler was confronted with a suspicious circumstance.

The dispatch with which the sale was consummated was not suspicious. In the first place, no reason to delay closing has been suggested. In any event, any haste was principally that of Keebler's making and not that of Atlantic. Keebler had been prepared to sell Meadors to Flora Mir Candy; active negotiations were being carried on and legal papers to consummate the transaction were in the course of preparation when Atlantic appeared on the scene. When agreement with Atlantic was reached, Keebler was pressing to consummate a more profitable transaction in lieu of a less profitable one before the latter was irrevocably lost.

The inquiries made by Atlantic with regard to the availability of Meadors' funds for payment of the purchase price were not such as to provide a basis on

which Keebler could suspect how payment would be made, especially, since Keebler made its position clear that Atlantic must consummate the purchase with its own funds. It is true that the record shows that Atlantic did not do so, but the record does not disclose an evidentiary basis to find, nor did the district court find, that Keebler knew or had reason to know of Atlantic's one-day loan and its immediate repayment with Meadors' funds. Whatever inkling Keebler may have had that Atlantic was interested in using Meadors' cash did not rise to a level sufficient to necessitate further investigation, especially in light of Atlantic's seemingly strong financial position and its apparent ability to finance the transaction with its own monies.[9]

Overall, we conclude that the seven factors considered singly or in concert, were not sufficient to suggest to Keebler that Atlantic did not intend to operate Meadors, but rather intended to loot it. As our discussion of the findings relied on to support the contrary conclusion discloses, there were many positive indications that Atlantic intended to operate Meadors and to operate it profitably. In addition, Atlantic's guarantee of the payment of principal of and interest on Meadors' debentures was significant, especially in the light of Atlantic's apparent financial ability to fulfill that commitment. It follows, we think, that Keebler's obligation to conduct a further investigation sufficient to satisfy a reasonable man that no fraud was intended or likely to result, or to refrain from the transfer of control, did not arise. The obligation could not have been breached, so that there was therefore no basis to impose liability on Keebler.

Reversed.

9. The district court found that when Atlantic, the day after the closing, borrowed funds from Meadors to repay People's National Bank, Atlantic had the financial ability to repay the loan.