Marilyn Shannon McCONAGHY, Receiver of American Universal Insurance Company and Canadian Universal Insurance Company, Plaintiff,

v.

SEQUA CORPORATION; G. Wayne Reeder; Six Corporation; One Hundred Thirteen Corporation; Chromalloy American, Inc.; Norman E. Alexander; Robert E. Davis; Gerald C. Gutterman; Charles S. Christopher; Carelton Burtt; and Towers, Perrin, Forster & Corsby, aka Forster & Corsby, Inc., Defendants.

No. 92–0512L.

United States District Court,
D. Rhode Island.

Nov. 5, 2003.

Melissa M. Horne, Winograd, Shine & Zacks, Providence, RI, Cynthia H. Hyndman, Ellen Robinson, Robinson Curley & Clayton, P.C., Chicago, IL, for Plaintiff.

Matthew F. Medeiros, Little, Bulman, Medeiros & Whitney, P.C., Providence, RI, Dennis T. Grieco, II, Michael G. Sarli, Gidley, Sarli & Marusak, Providence, RI, John H. Blish, Joseph V. Cavanagh, Jr., Blish & Cavanagh, Providence, RI, Daniel King, Mark M. Maloney, King & Spalding, Atlanta, GA, David M. Hashmall, Leonard Lesser, Goodwin, Proctor LLP, New York, NY, for Defendant.

Carleton Burtt, Waterboro, SC, pro se.

### DECISION AND ORDER

LAGUEUX, Senior District Judge.

This matter comes before the Court on the motion of the Sequa Defendants for Summary Judgment on remaining Counts III, V, and VI of Plaintiff's Amended Complaint, filed pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The "Sequa Defendants" in this litigation are comprised of the Sequa Corporation (Sequa), its subsidiary, Chromalloy American, Inc. (Chromalloy), and three individuals working with and for Sequa as corporate officers, directors, and controlling shareholders, Norman E. Alexander (Alexander), Robert E. Davis (Davis), and Gerald C. Gutterman (Gutterman).[1] The disputed claims arise from a lawsuit brought by Marilyn Shannon McConaghy (Receiver or Plaintiff), in her capacity as the Receiver for American Universal Insurance Company (AUIC) and Canadian Universal Insurance Company (CUIC), against the Sequa Defendants and others who will be mentioned hereafter as they relate to the issues presented. For the reasons explained herein, the Court concludes that the Sequa Defendants' Motion for Summary Judgment on remaining Counts III, V, and VI should be denied.

### BACKGROUND

#### I. Factual Synopsis

When considering a motion for summary judgment, this Court must consider the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," Fed.R.Civ.P. 56(c), and view the facts presented therein in the light most favorable to the nonmoving party. *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Here, because the Sequa Defendants have moved for summary judgment, this writer will recite the following background information in the light most favorable to the Plaintiff.

#### A. Sequa, Chromalloy, and the Insurance Companies

Prior to 1986, AUIC and CUIC, two insurance companies, were owned and managed by Chromalloy, a holding company wholly owned by Sequa, the key defendant in the instant litigation. AUIC was domiciled in Rhode Island, and CUIC was a wholly owned subsidiary of AUIC. These two insurance companies had considerable assets, including a portfolio of more than

---

**1.** Alexander was Sequa's Chairman and controlling shareholder during the relevant time period. Davis was the Director and President of Sequa and Chromalloy. Gutterman was Sequa's Executive Vice President of Finance and Administration.

$63 million in government bonds and more than $108 million in private company stocks and bonds, as well as multiple real estate holdings. However, although asset rich, these companies were consistently unprofitable, and Chromalloy officials began to consider liquidating them.

In 1986, Chromalloy retained Tillinghast & Company (Tillinghast) to market the insurance companies. Tillinghast's efforts to sell AUIC and CUIC were spearheaded by Howard T. Cohn (Cohn), a firm principal. Cohn was assisted by a Tillinghast associate named Ronald L. Wilson (Wilson). Together, Cohn and Wilson contacted as many as eighteen different insurance operations and investors, but for a long period of time none of them were interested in buying control of AUIC and CUIC.

## B. Christopher's First Purchase Attempt

Late in 1986, Cohn and Wilson finally found an interested investor by the name of Carleton Burtt (Burtt). Burtt did not have the money to purchase the two insurance companies, but he brought the deal to another potential investor, Charles Christopher (Christopher). At this time, Christopher represented himself as having substantial assets to invest, including $3 million in personal funds, plus an additional $17 million in equity. Christopher also represented himself as the director of a Texas bank. However, Christopher had no experience managing an insurance company, and his past was somewhat checkered, including a felony conviction, one business bankruptcy, and one personal bankruptcy. In addition, Christopher had been fired from his last job. These facts notwithstanding, Christopher and Chromalloy formulated a deal whereby he was to purchase the two insurance companies after presenting suitable financing. This understanding is documented in a letter of intent signed in December 1986.

By early January 1987, however, Wilson and Chromalloy appeared to second-guess their attempted sale of AUIC and CUIC to Christopher. For starters, Christopher remained unable to produce the necessary financing. According to the Receiver, over the course of the time spent dealing with Christopher, both Wilson and senior Chromalloy officials responsible for the insurance companies' divestiture learned that Christopher's initial representations regarding his available assets were false: Christopher did not have $3 million in personal assets, he did not have $17 million in equity, and he refused to produce a financial statement despite their requests that he do so. As if this wasn't bad enough, Wilson and Chromalloy allegedly learned that Christopher was not really a director of a bank in Texas, but instead, merely held an outstanding loan from that bank. According to the Receiver, these misrepresentations, Christopher's inability to raise the promised funds, and a general sentiment of distrust voiced by AUIC managing officers after dealing with Christopher led Chromalloy's senior officials to terminate all dealings with Christopher. In any event, it is undisputed that Chromalloy terminated this first round of negotiations before a transfer of control was consummated.

## C. Sequa is Unable to Locate Another Buyer

As 1987 rolled on, Cohn and Wilson continued their attempts to secure a buyer for the insurance companies. In February of that year, Cohn and Wilson remained unable to secure a potential investor. At this point, Sequa, as owner and manager of Chromalloy, pulled the insurance companies from the market to reassess the situation. Over the summer of 1987, AUIC officials prepared an extensive evaluation of the insurance companies for Sequa. By this time, Sequa had merged Chromalloy's

operations into its own. Meanwhile, Sequa had Tillinghast prepare an independent evaluation of AUIC and CUIC.

In September of 1987, AUIC officials reported to Sequa that the insurance companies needed a substantial additional infusion of capital to return them to profitability. According to the Receiver, this amount was $60 million. Around the same time, Tillinghast consultants recommended that Sequa refrain from making an additional investment in the two insurance companies, advising them that they could save as much as $36 million if they opted for a wind-down operation. Shortly thereafter, Sequa resolved to sell the insurance companies, and decided to reapproach Christopher.

D. Sequa Sells to Christopher and Reeder

According to the Receiver, by the second week of September, 1987, Sequa's Chairman and controlling shareholder, Alexander, began negotiating a deal to sell his shares in the insurance companies to Christopher. This decision to sell was executed by Sequa's Executive Committee, which ordered its Executive Vice President of Finance and Administration, Gutterman, to negotiate terms with Christopher to transfer control of the insurance companies to a corporation controlled by Christopher, Resolute Holdings, Inc. (RHI). The Receiver alleges that certain managing officials at the insurance companies discovered that Christopher was again involved in a purchase attempt, and they protested to Sequa that they did not want to do business with Christopher. According to the Receiver, Sequa allegedly gave these individuals "stay bonuses" to keep them from quitting their positions with the insurance companies and to facilitate the RHI deal going through.

Before the deal could commence, however, Christopher and RHI still needed to secure adequate financing. When he first began negotiations, Christopher made representations to Sequa that RHI was set to acquire certain assets from Whitehall Capital Corporation, and that he planned to use these assets to capitalize the two insurance companies. These assets proved unavailable, however. Christopher asked Sequa to assist him in purchasing the Whitehall assets, but Sequa refused. At this point, Sequa allegedly threatened to stop negotiating with Christopher unless he could secure a firm commitment on financing.

In December 1987, Christopher informed Sequa officials that he had secured financial backing through G. Wayne Reeder (Reeder). According to the Receiver, Tillinghast investigated Reeder, and discovered that his real estate development company, Hill Top Developers, Inc., had a net worth of $23.4 million, but approximately $80 million in long and short-term debt. Reeder also had no experience in the insurance business, and was allegedly involved with Herman Beede, a man under criminal indictment and previously convicted for defrauding a savings and loan association.

Initially, Sequa told Christopher and Reeder that they needed cash up front to proceed with the purchase deal. In response, Christopher and Reeder promised to secure cash up front for financing, but never demonstrated that they had indeed acquired it. On January 4, 1988, Sequa signed a stock purchase agreement with Christopher and Reeder. By the terms of this agreement, entitled "Stock Purchase Agreement," RHI was to purchase the controlling stock in AUIC and CUIC in exchange for the following:

1) $14.5 million in cash.

2) An assignment of Chromalloy's right, title, and interest in a $5,516,000 tax recoverable Chromalloy owed AUIC.

3) A release from obligations on a $9.7 million loan to an affiliated Canadian insurer.

4) Cancellation of all inter-company liabilities.

5) A $10 million letter of credit to be furnished by Christopher and Reeder to replace Sequa's guaranty of a Chromalloy obligation to Irving Trust Company.

### E. Sequa and Christopher Seek DBR Approval

As the insurance companies were domiciled in Rhode Island, the proposed transfer of control from Sequa to Christopher and Reeder was set to take place pursuant to Rhode Island law. Pursuant to R.I. Gen. Laws § 27–35–2, Sequa was required to secure approval from the Rhode Island Department of Business Regulation (DBR) before the sale to RHI could occur. A portion of this approval process was an administrative "Form A" Hearing, which was scheduled for May 26, 1988.

On the evening of May 25, 1988, the night before the hearing, the Receiver claims that Christopher had a dinner meeting with Cohn, Wilson, and Gutterman. At this meeting, Christopher and Gutterman renegotiated several of the most significant terms of the stock purchase agreement, including formally changing the purchase price and excusing Christopher and Reeder from producing the $10 million letter of credit. These altered terms were incorporated into a new document entitled, "Stock Purchase Closing Agreement."

The following day, Gutterman and Christopher both testified at the DBR Form A Hearing. Neither produced the new closing agreement or disclosed to the regulators that many of the original terms of the Stock Purchase Agreement were altered the night before. After the hearing, the DBR issued an order *conditionally* approving the sale as described in the Stock Purchase Agreement with certain restrictions. Once this conditional approval was secured, Sequa proceeded to close the deal, transferring control of AUIC and CUIC to RHI. At the closing, the Receiver claims that Sequa further augmented the terms of the deal by agreeing that Christopher could finance RHI's closing costs and attorneys' fees through the insurance companies' assets. As with the newly negotiated sale terms, Sequa and Christopher never disclosed this new facet of the agreement to the regulators.

### F. Christopher and Reeder Loot the Insurance Companies

After acquiring control over AUIC and CUIC, Christopher and Reeder, both then principals of RHI, looted the two insurance companies' assets and used them for their own purposes, forcing the insurance companies into receivership. Christopher and Reeder were later convicted on wire and mail fraud charges in connection with the sale and misappropriation of assets from the insurance companies. *See United States v. Christopher*, 142 F.3d 46, 49–50 (1st Cir.1998); *United States v. Reeder*, 170 F.3d 93, 100–02 (1st Cir.1999). In this instant litigation, the Receiver seeks recovery on behalf of the insurance companies for damages arising from six so-called "looting transactions" Christopher and Reeder performed after taking control of the insurance companies. In her brief, Plaintiff describes these transactions as follows:

> The looting transactions at issue are: (1) "Fiberflex," by which Christopher stole $3.4 million cash from the Insurance companies to pay guarantees he owed on certain notes; (2) "Mydar," by which Christopher and Reeder stole $5.4 million cash from the Insurance Companies to pay liens owed on the properties securing the collateral note; (3) "Desert Aire," by which Christopher and Reeder stole $15 million cash from the Insur-

ance Companies to pay liens on the collateral note properties and other Reeder owned properties; (4) "Christopher House," by which Christopher stole $1.7 million cash from the Insurance Companies to pay off the mortgage and other liens on his Dallas home; (5) "Florence Gardens," by which Reeder stole $1.2 million cash from AUIC to satisfy an agreement between CU, Ltd. and another Reeder entity to purchase real estate in Arizona; and (6) payments incurred in connection with a transaction whereby Christopher and Reeder used AU, Ltd. assets to pay Sequa amounts owed Sequa in connection with the purchase of [Chromalloy American Insurance Group, Inc.].

Plaintiff's Brief at p. 36–37, n. 25.

In her Amended Complaint, Plaintiff states six different theories of recovery against Sequa, Chromalloy, and the individual Sequa defendants then working with and for Sequa.[2] In essence, the Receiver claims that Sequa and those named individuals working with or for Sequa, either knew or should have known that the unsavory Christopher and Reeder would loot the insurance companies following their sale, and are therefore liable for the damages AUIC and CUIC suffered at the hands of these looters. Counts I and II allege claims against Sequa and Chromalloy under the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961 *et seq.*, and remaining Counts III through VI allege various common law claims against the Sequa Defendants, including negligence, breach of contract, and breach of fiduciary duty.[3] The parties do not dispute that Rhode Island substantive law applies to these common law claims.

## II. Travel of the Lawsuit

This case began in 1992, when Plaintiff's predecessor Receiver, Sheldon Whitehouse, originally filed his complaint here in the United States District Court for the District of Rhode Island. On April 16, 1993, the Judicial Panel on Multidistrict Litigation transferred this case to the United States District Court for the District of Arizona, and consolidated it with related actions for pretrial proceedings and discovery. There, the consolidated cases were assigned to Judge Roger J. Strand. After first ruling on certain dispositive motions before that Court, Judge Strand supervised consolidated discovery in the instant case and other related actions until April 15, 1999. Thereafter, he supervised expert discovery in these consolidated cases until September 15, 2000.

Over the course of this discovery period, the Receiver obtained default judgments against RHI, Reeder, Christopher, and the various Reeder-controlled entities originally included as defendants in Plaintiff's Amended Complaint.[4] In addition, the Re-

---

**2.** The Amended Complaint alleges nine counts total, but only the first six of these are against Sequa, Chromalloy, and the individuals connected with Sequa, Alexander, Gutterman, Davis, plus Wilson and Burtt. Because this instant motion for summary judgment was brought by the Sequa Defendants, this writer will only address those counts pertaining to the moving defendants, Counts I through VI.

**3.** Although Plaintiff has included a prayer for a jury trial in her Amended Complaint, this Court notes that both the First Circuit and the Rhode Island Supreme Court have recognized

that breach of fiduciary duty claims are equitable in nature. *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 51 F.Supp.2d 81, 90–91 (D.R.I.1999) (citing *In re Evangelist*, 760 F.2d 27, 29 (1st Cir.1985); *Olney v. Conanicut Land Co.*, 16 R.I. 597, 18 A. 181, 182 (R.I. 1889)).

**4.** Although the parties concede that these default judgments were entered, this Court's docket sheet does not reflect Christopher, Reeder, and the Reeder entities' removal as parties. As a result, this writer has included

ceiver settled its claims against RHI's attorneys (the Forster and Corsby law firm), and voluntarily dismissed its claims against Wilson. On October 2, 2001, Judge Strand granted a summary judgment motion dismissing all claims asserted against Tillinghast. As a result of these various proceedings, the only remaining defendants in this action at the close of discovery were Sequa, Chromalloy, the individuals connected with Sequa, Alexander, Davis, and Gutterman, plus Burtt.

## III. The Arizona Summary Judgment Rulings

On July 2, 1999, after the close of fact discovery, but before the case was remanded to this Court for trial, Sequa and Chromalloy moved pursuant to Fed.R.Civ.P. 56(d) for partial summary judgment on Counts I, II, IV and V of the Amended Complaint. Judge Strand ruled on this motion in two separate orders, one dated August 29, 2001, and the second dated September 4, 2001. The August Order granted the motion for summary judgment on Counts I and II (alleged RICO violations). Judge Strand concluded that the Receiver could not produce evidence that would lead a reasonable trier of fact to conclude that Sequa and Chromalloy had engaged in a pattern of racketeering activity. In addition to this ruling, Judge Strand made the following observations:

> There is no evidence that Sequa was aware that RHI or its principals intended to loot [AUIC and CUIC] and violate the conditional approval order of the DBR. . . . The Court is not troubled by the Sequa defendants' knowledge of Christopher's background. . . . Nor does the Court find anything suspicious about RHI's financial status prior to the sale.

August 29, 2001 Order, at 9–10.

The September Order dealt with Counts IV and V. Count IV of the Receiver's complaint advanced a theory of recovery based on allegations that Sequa's sale of AUIC and CUIC to RHI was never fully approved by the DBR, and, as a result, was ineffective as a matter of law. Thus, Count IV alleged that Sequa, Chromalloy, and the individuals connected with Sequa owed a continuing fiduciary duty to the insurance companies which did not terminate on the date of the attempted transfer to RHI, but, instead, remained in effect throughout the time period in which Christopher and Reeder engaged in their looting activities, and which Sequa and its compatriots breached when they failed to prevent the looting. Count V was a breach of contract claim. In his September Order, Judge Strand granted the motion for summary judgment on Count IV, but denied it as to Count V. In ruling on Count IV, Judge Strand opined that Plaintiff had failed to establish that the transfer was ineffective as a matter of law, and that Sequa, Chromalloy, and the Sequa individuals had no ongoing fiduciary duty to the insurance companies beyond the date that the transfer to RHI took place. In addition to this ruling, Judge Strand made the following statements:

> The Court finds, based upon a thorough review of the record, that Sequa did not have information, which would have made it necessary to cancel the sale of [the insurance companies] to RHI. The Court does not find that RHI, or its principals, Christopher and Reeder's behavior or background raised sufficient suspicion to put Sequa on notice that the investment assets of the insurance companies would be looted post sale, or that RHI would not be able to operate and manage the companies with cash and to continue to run them as ongoing concerns. . . . Sequa's purpose in selling [the insurance companies] was to rid

these individuals and entities in the case caption.

itself of an unprofitable subsidiary. This was not a breach of fiduciary duty.

September 4, 2001 Order at 6–7.

Following the entry of these two Orders, the Judicial Panel on Multidistrict Litigation ordered the case remanded to this Court on December 5, 2001. Once the case returned to the District of Rhode Island, the Sequa Defendants filed the instant motion for summary judgment on all remaining Counts alleged against them, namely, Counts III, V, and VI. As grounds for this motion, the Defendants argue, first, that in light of Judge Strand's previous rulings, the law of the case doctrine mandates summary judgment on Counts III and VI of the Receiver's Amended Complaint. Second, they argue in the alternative that summary judgment is appropriate on Count III because it is based on a "negligent sale to looters" theory, referred to commonly as the *Insuranshares* Doctrine, *see Insuranshares Corp. of Delaware v. Northern Fiscal Corp.,* 35 F.Supp. 22 (E.D.Pa.1940), a cause of action not previously recognized under Rhode Island law. Finally, the Sequa Defendants ask this Court to grant summary judgment on all remaining counts, arguing that Plaintiff's expert witness cannot establish proximate cause. Each of these arguments will be discussed in turn.

### DISCUSSION

### I. Subject Matter Jurisdiction

Although the RICO Counts are no longer a part of this litigation (except for purpose of appeal), this Court has subject matter jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1332(a)(1), the federal diversity statute. Here, complete diversity exists between the parties. Plaintiff is the Receiver for AUIC and CUIC, insurance companies formerly domiciled in and doing business in Rhode Island, and brings suit on behalf of the companies' policyholders and creditors. Defendant Sequa is a Delaware Corporation with its principal place of business in New York, and the Sequa individuals are residents of New York and Florida. Burtt is a resident of South Carolina. In addition, the amount in controversy well exceeds $75,000.

### II. Standard of Review

When ruling on a motion for summary judgment or partial summary judgment, the Court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. *See Continental Cas. Co.,* 924 F.2d at 373. Once this is done, Rule 56(c) requires that summary judgment be granted if "there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A material fact is one affecting the lawsuit's outcome under the applicable law. *URI Cogeneration Partners, L.P. v. Board of Governors for Higher Education,* 915 F.Supp. 1267, 1279 (D.R.I.1996). Factual disputes are genuine when "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To win summary judgment on a particular count of the complaint, the moving party, must show that "there is an absence of evidence to support" the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In response, the nonmoving party, cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988).

### III. Law of the Case

As noted above, in his two Orders dealing with the RICO Counts and Counts VI

and V, Judge Strand also made findings that Christopher and Reeder's background and actions before the sale were not sufficiently suspicious as to put Sequa on notice that these men would loot the insurance companies post-sale, and that Sequa's decision to sell the two companies under these circumstances did not amount to a breach of fiduciary duty. Although neither count was before the Judge at the time, the Sequa Defendants suggest that these observations relate directly to Counts III and VI of Plaintiff's Amended Complaint.[5] The Sequa Defendants argue that Judge Strand's findings regarding notice and suspicious circumstances should be construed as legal determinations "that there [are] no triable issues of 'foreseeability' or 'suspicious circumstances' based on the entire discovery record," and, as such, should be recognized as the law of the case, thereby mandating summary judgment on Counts III and VI.

At the heart of this question is the law of the case doctrine. That doctrine requires that legal decisions, or rulings of law, made by a court at a particular stage of a civil or criminal proceeding become "law of the case," and that thereafter these determinations govern the same issues in subsequent stages of the same litigation, unless corrected by appellate review. *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983); *Ellis v. United States,* 313 F.3d 636, 646 (1st Cir.2002). As the First Circuit has observed, the law of the case doctrine "means that a court ordinarily ought to respect and follow its own rulings, made earlier in the same case." *Ellis,* 313 F.3d at 646. This concept applies to all legal determinations made at the same level of proceedings, regardless of whether the rul-

ings were made by a predecessor judge. *See id.* ("The orderly functioning of the judicial process requires that judges of coordinate jurisdiction honor one another's orders and revisit them only in special circumstances.").

However, not every statement made or word written by a judge while rendering a decision automatically becomes the law of the case. As the United States Supreme Court has recognized, only legal determinations, or rulings of law, are properly regarded as law of the case governing the same issue in subsequent proceedings. *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988); *Arizona,* 460 U.S. at 618, 103 S.Ct. 1382. Further, an issue must be actually decided on the merits before it can be considered the law of the case. 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4478 at 664–67 (2002). Thus, by definition, dicta cannot constitute law of the case. *Bull HN Information Systems, Inc. v. Hutson,* 229 F.3d 321, 326 n. 3 (1st Cir.2000) ("The law of the case doctrine does not apply to dicta."); *Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 459 (1st Cir.1992) ("Dictum constitutes neither the law of the case nor the stuff of binding precedent."). Dicta constitutes "[o]pinions of a judge which do not embody the resolution or determination of the specific case before the court." Black's Law Dictionary 454 (6th ed.1990).

Here, this writer is faced with commentary made by a coordinate judge while ruling on a previous motion for partial summary judgment on specific counts of

---

**5.** Count III alleges that Sequa was negligent in failing to further investigate Christopher and Reeder prior to the sale when suspicious circumstances were present; Count VI alleges

Sequa breached its fiduciary duty to the insurance companies in selling them to RHI when Sequa knew or should have known that looting was imminent post-sale.

Plaintiff's Amended Complaint. While this commentary is interesting, it does not pertain to Judge Strand's legal rulings granting summary judgment on Plaintiff's RICO and post-sale breach of fiduciary duty claims. Such non-essential judicial observations are not a part of the court's holding, and "have no binding effect in subsequent proceedings in the same (or any other) case." *Municipality of San Juan v. Rullan,* 318 F.3d 26, 28 n. 3 (1st Cir. 2003). Rather, this writer's predecessor went beyond the confines of summary judgment and engaged in fact-finding, weighing the evidence and making credibility determinations. Because such determinations were immaterial to Judge Strand's rulings, and because such findings of fact were improper at the summary judgment stage, they amount to dicta, and cannot qualify as the law of the case in these later proceedings.

█ As this writer noted from the bench, the function of a judge facing a motion for summary judgment is not to make findings of fact, but rather, to determine whether there are genuine *issues* of material fact remaining for trial. When ruling on a motion for summary judgment, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood." *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987). A judge deciding such a motion should not invade the province of the trier of fact by weighing the evidence or making credibility determinations. *See Mahan v. Boston Water & Sewer Comm'n,* 179 F.R.D. 49, 56 (D.Mass.1998). Instead, it is the responsibility of the trial judge to determine whether a reasonable trier of fact could find for the nonmoving party based on the admissible evidence. *Id.* at 56. After ascertaining what material facts "are actually and in good faith

controverted," Rule 56(d) requires the hearing judge to "make an order specifying the facts that appear without controversy" so that these specified facts can "be deemed established," thus limiting the issues for trial to those where a genuine issue of material fact remains. Fed. R.Civ.P. 56(d).

Here, contrary to the Sequa Defendants' assertions, Judge Strand did not formulate a legal decision that no triable issues of fact remained as to foreseeability or suspicious circumstances. Instead, in the process of deciding that no reasonable trier of fact could conclude that Sequa engaged in a pattern of racketeering activity or that Sequa breached a continuing fiduciary duty to the insurance companies after the sale was completed, this writer's predecessor weighed the evidence before him, made credibility determinations, and issued findings as to parts of the case not then before him. In his two orders, Judge Strand made the following findings based on his review of the record that were immaterial to summary judgment on Counts I, II, and IV:

1) that there is no evidence that Sequa *was aware* that RHI, Christopher, or Reeder intended to loot the insurance companies;

2) that there was nothing suspicious about RHI's financial status before the sale;

3) that Sequa did not have information which would have made cancelling the sale of AUIC and CUIC necessary;

4) that there was nothing about RHI, Christopher, or Reeder's background that would have raised sufficient suspicion as to put Sequa on notice that post-sale looting was likely;

5) that before the sale RHI appeared legitimately interested in acquiring the in-

surance companies and continuing their operations;

6) that Sequa's only purpose in selling the insurance companies was to unload an unprofitable subsidiary;

7) that Sequa did not breach their fiduciary duty to the insurance companies in selling them to RHI.

By weighing the evidence and formulating these conclusions, this writer's predecessor did not determine what issues remained controverted between the parties, but instead attempted to resolve these issues finally. Such a determination remains within the province of the trier of fact and beyond the realm of summary judgment determinations. Because these determinations amount to nonessential findings of fact, and because they do not relate to the legal issues actually decided by Judge Strand, this Court concludes that they are dicta, and thus cannot not consider them the law of the case.[6] As a result, the Sequa Defendants are not entitled to summary judgment on Counts III and VI on law of the case grounds.

## IV. The *Insuranshares* Doctrine

The Sequa Defendants' next argument relates solely to Count III of Plaintiff's Amended Complaint, which alleges negligence on the part of the Sequa Defendants based on the *Insuranshares* Doctrine, first articulated in *Insuranshares Corp. of Delaware v. Northern Fiscal Corp.*, 35 F.Supp. 22 (E.D.Pa.1940). They point out that the *Insuranshares* doctrine has yet to be recognized as a cause of action under Rhode Island law, and argue that it would not be adopted by the Rhode Island Supreme Court because its tenets are contrary to this state's existing conception of common law negligence, citing *D'Ambra v. Peak Building Corp.*, 680 A.2d 939, 941

(R.I.1996). The Sequa Defendants also suggest that the facts of this case do not support a claim under the doctrine, and that they are entitled to judgment on this Count as a matter of law. Thus, the Sequa Defendants ask for summary judgment on Count III.

### A. *Insuranshares* and Rhode Island Law

■ In *Insuranshares*, the District Court for the Eastern District of Pennsylvania recognized a cause of action based on a negligent sale to looters theory of liability. 35 F.Supp. at 25. There, the Insuranshares Corporation brought suit against its former officers, directors, some of its former stockholders, and other individuals to recover for damages that the corporation incurred after the management group sold control of the corporation to a group who, similar to the facts of this instant case, proceeded to loot the corporation's assets after the sale took place. *Id.* at 23–24. Noting a series of unsavory facts about the new owners known or otherwise imputed to the managing directors before the sale of control took place, the *Insuranshares* Court recognized that when certain suspicious circumstances are present to tip off a management team that post-sale looting is imminent, said corporate managers owe a duty to the corporation to conduct a reasonable investigation of the potential buyers prior to the sale to prevent post-sale looting. *Id.* at 25–26. The Court summarized this duty of care as follows:

> Those who control a corporation ... owe some duty to the corporation in respect of the transfer of the control to outsiders. The law has long ago reached the point where it is recognized that such persons may not be wholly oblivious of

---

**6.** Plaintiff has also filed a separate motion to vacate Judge Strand's factual findings. Because the Court considers them dicta, they have no binding effect on the outcome of this case. Thus, Plaintiff's motion to vacate is superfluous, and it is denied as moot.

the interests of everyone but themselves, even in the act of parting with control, and that, under certain circumstances, they may be held liable for whatever injury to the corporation made possible by the transfer. Without attempting any general definition, and stating the duty in minimum terms as applicable to the facts of this case, it may be said that the owners of control are under a duty not to transfer it to outsiders if the circumstances surrounding the proposed transfer are such as to awaken suspicion and put a prudent man on his guard—unless a reasonably adequate investigation discloses such facts as would convince a reasonable person that no fraud is intended or likely to result. Thus, whatever the extent of the primary duty may be, circumstances may be sufficient to call into being the duty of active vigilence [sic] and inquiry. If, after such investigation, the sellers are deceived by false representations, there might not be liability, but if the circumstances put the seller on notice and if no adequate investigation is made and harm follows, then liability also follows.

*Insuranshares*, 35 F.Supp. at 25.

The *Insuranshares* Court held that, under the facts of that case, the corporate management group was faced with sufficient suspicious circumstances surrounding the transfer to awaken a prudent man's suspicions, and thus were under a pre-sale duty to investigate the potential buyers. *Id.* at 25 and 26–27. The Court identified five main factors known to the managers before the sale that it considered duty-triggering, suspicious circumstances. These factors were: 1) previous looting of the same corporation, conducted in a similar manner, only five years earlier; 2) the buyer's planned use of the corporation's own assets to finance the transfer; 3) the buyer's insistence that a large portion of the corporation's assets be converted into cash before the sale so that the funds would be available immediately after the transfer of control; 4) the inflated price the buyers were willing to pay for control of the corporation; 5) the fact that the managers knew very little about their intended buyers at the time the transfer took place. *Id.* at 25–26. The Court held that these factors, known to the management group before the transfer, were sufficiently suspicious as to prompt a prudent man to conduct a reasonable investigation of the buyers before allowing the sale to occur. *Id.* at 26–27.

The Supreme Court of Rhode Island has not yet spoken directly on whether a viable cause of action for negligent sale of a corporation to looters, as described in *Insuranshares*, exists under Rhode Island law. In such a situation, it is proper for this writer to consider "persuasive adjudications by the courts of sister states, learned treatises, and public policy considerations identified in state decisional law" to determine whether Rhode Island law would impose such a duty on corporate managers such as the Sequa Defendants. *Blinzler v. Marriott Int'l, Inc.,* 81 F.3d 1148, 1151 (1st Cir.1996). The purpose of this inquiry is to determine how the instant issue would be resolved by the Rhode Island Supreme Court, "taking into account the broad policies and trends so evinced." *Clarke v. Kentucky Fried Chicken of California, Inc.,* 57 F.3d 21, 25 (1st Cir.1995) (quoting *Michelin Tires (Canada) Ltd. v. First Nat'l Bank,* 666 F.2d 673, 682 (1st Cir.1981)).

Since *Insuranshares* was decided in 1940, courts have widely accepted its duty of care for controlling transferors. *See Clagett v. Hutchison,* 583 F.2d 1259, 1262 (4th Cir.1978); *Swinney v. Keebler Co.,* 480 F.2d 573, 577 (4th Cir.1973); *Estate of Hooper v. Government of Virgin Islands,* 427 F.2d 45, 47 (3d Cir.1970); *McDaniel v.*

*Painter,* 418 F.2d 545, 547 (10th Cir.1969); *Seagrave Corp. v. Mount,* 212 F.2d 389, 395 (6th Cir.1954); *Harris v. Carter,* 582 A.2d 222, 233 (Del.Ch.1990). Further, several treatises recognize and adopt the *Insuranshares* standard, and place a duty of care on corporate managers and, in some instances, even controlling shareholders, to refrain from selling control of the corporation to potential looters when suspicious circumstances are present. *See* Edward Brodsky and M. Patricia Adamski, *Law of Corporate Officers and Directors: Rights, Duties and Liabilities* § 5:3–4 (2003); William M. Fletcher, 3 *Fletcher Cyclopedia of the Law of Private Corporations* § 900 (2003); William M. Fletcher, 12B *Fletcher Cyclopedia of the Law of Private Corporations* § 5805 (2003); James L. Rigelhaupt, *Controlling Stockholder's Breach of Duty to Investigate Motive and Intent of Purchaser Before Selling Stock,* 9 Am.Jur. Proof of Facts 2d 261 at §§ 3–4 (2003). As these authorities recognize, the *Insuranshares* duty .to refrain from selling control of a corporation to potential looters arises from the fiduciary relationship that exists between those parties with a controlling interest in the corporation and the corporation itself. Brodsky and Adamski, *supra* at § 5:3; Fletcher, 12B *supra* at § 5805; Rigelhaupt, *supra* at 2–4.

Courts have recognized the *Insuranshares* doctrine as the majority view on this subject. *Harris,* 582 A.2d at 233; *Swinney,* 480 F.2d at 577. The minority view, defined in *Levy v. American Beverage Corp.,* 265 A.D. 208, 38 N.Y.S.2d 517, 525–27 (N.Y.A.D.1942), requires that controlling shareholders have actual knowledge of planned post-sale looting by the buyer before liability can attach. However, later decisions have rejected this actual-knowledge requirement in favor of the *Insuranshares* conception of the duty, requiring a pre-sale investigation when the circumstances surrounding a proposed sale are sufficiently suspicious as to put a prudent person on his or her guard. *See Harris,* 582 A.2d at 234; *Swinney,* 480 F.2d at 577; *Clagett,* 583 F.2d at 1262; *Estate of Hooper,* 427 F.2d at 47; *McDaniel,* 418 F.2d at 547.

The Sequa Defendants argue that Rhode Island would reject the *Insuranshares* duty of care based upon its holding in *D'Ambra.* In *D'Ambra,* an automobile accident case, the Rhode Island Supreme Court concluded that the acts of a third party driver who illegally failed to stop at a stop sign constituted an independent, intervening cause of the plaintiffs' injuries, noting that a defendant "was not bound to anticipate mischievous or wrongful acts on the part of others, and hence not bound to guard against them." 680 A.2d at 941 (quoting *Mahogany v. Ward,* 16 R.I. 479, 484, 17 A. 860, 862 (1889)). The Sequa Defendants argue, based on this holding, that Rhode Island would not support a cause of action for negligent sale to potential looters, as such a cause of action would impose liability on defendants for failing to correctly anticipate another's tortious conduct.

However, such an application does not take into account Plaintiff's allegation that Sequa, Chromalloy, and the Sequa individuals, as controlling owners and corporate managers of the two insurance companies, had a fiduciary relationship with these companies, and, as such, had heightened duties of loyalty and care to AUIC and CUIC than would a ordinary tortfeasor under Rhode Island law. Rhode Island has long recognized that corporate officers, directors, and even shareholders of closely-held corporations are fiduciaries to their respective corporations, owing a duty of loyalty to the corporation and its shareholders. *See Hendrick v. Hendrick,* 755 A.2d 784, 789 (R.I.2000); *A. Teixeira & Co. v. Teixeira,* 699 A.2d 1383, 1386 (R.I. 1997). In *Teixeira,* the Rhode Island Su-

preme Court elaborated on this fiduciary responsibility, quoting the Delaware Supreme Court:

A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage to which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers.

699 A.2d at 1386 (quoting *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del.1939)).

The Court then went on to expand the fiduciary responsibility to controlling and managing shareholders, opining, "that the term 'fiduciary' is a broad concept that might correctly be described as 'anyone in whom another rightfully reposes trust and confidence.'" *Teixeira,* 699 A.2d at 1387 (quoting Francis X. Conway, *The New York Fiduciary Concept in Incorporated Partnerships and Joint Ventures,* 30 Fordham L.Rev. 297, 312 (1961)). Thus, under Rhode Island law, a corporate fiduciary is in a position analogous to a trustee, and is therefore bound to "act with the utmost good faith" to protect his corporate beneficiary's interests and refrain from exercising his own interests at the expense of the corporation. *Point Trap Co. v. Manchester,* 98 R.I. 49, 199 A.2d 592, 596 (1964) As a logical off-shoot of these fiduciary requirements, Rhode Island has an established rule that a fiduciary may not proceed with a sale that benefits himself to the detriment of his beneficiary. *See id.* Thus, Rhode Island recognizes the same concept of fiduciary responsibility that the *Insuranshares* Doctrine implicates.

After reviewing the literature on this theory of recovery, including its widespread adoption as the majority rule, and after considering the doctrine in light of existing state law, this writer is convinced that Rhode Island would adopt the *Insuranshares* Doctrine as it is defined in its namesake case and the pertinent treatises. *See* 35 F.Supp. at 25; Brodsky and Adamski, *supra* at § 5:3–4; Fletcher, 12B *supra* at § 5805. The scope of this duty imposing liability for the negligent sale of a corporation to looters is ably described in the *Law of Corporate Officers and Directors: Rights, Duties and Liabilities:*

Where the circumstances surrounding a proposed sale of control would arouse suspicion in the reasonable prudent person that the purchaser of control is likely to mismanage the corporation and loot corporate assets, then the control seller has a duty to undertake a reasonable investigation as to the reputation and intention of the purchaser. If suspicious circumstances are such to put the seller on notice, and the seller proceeds with the sale without satisfying himself that injury to the corporation is unlikely, then the seller will be held liable for any resulting harm.

Brodsky and Adamski, *supra* at § 5:3.

However, as this treatise recognizes, this duty of care does not force corporate fiduciaries to assume the role of an insurer in corporate sale transactions, and does not make them liable for post-sale looting when no duty-triggering suspicious circumstances were present before the sale. "[I]n the absence of suspicious circumstances alerting the control seller to the likelihood of harm, the seller will not be liable for the purchaser's injurious actions." *Id.* When the requisite suspicious circumstances are present, the control seller has a duty to perform a reasonable investigation prior to the sale.

*Insuranshares,* 35 F.Supp. at 25. Failure to reasonably investigate under these circumstances subjects the control seller to potential future liability if post-sale looting occurs. *Id.*

■ This writer now turns to what sort of factors courts and treatises have recognized as suspicious circumstances triggering an *Insuranshares* investigation by corporate managers before selling control to a third party. Based on this writer's research in the area, the Court recognizes that suspicious circumstances in a corporate control transfer can include, but are not limited to, the following criteria: 1) an excessive or inflated purchase price offered for the control shares, incommensurate with the inherent value of control stock; 2) awareness on the part of the seller that a buyer intends to finance the purchase with the acquired corporation's own assets; 3) insistence by a buyer that corporate assets be converted to cash and made available either prior to or immediately after the transfer; 4) notice of a buyer's reputation for fraudulent conduct, including prior acts of looting or participation in other fraudulent activities; 5) notice that a buyer lacks any source of adequate funds to finance the purchase. *See Insuranshares,* 35 F.Supp. at 26–27; *Harris,* 582 A.2d at 234; *Swinney,* 480 F.2d at 577; *Clagett,* 583 F.2d at 1262; *Estate of Hooper,* 427 F.2d at 47; *McDaniel,* 418 F.2d at 547; *see also* Brodsky and Adamski, *supra* at § 5:4 (defining suspicious circumstances in the context of a sale of control). This Court notes that in presenting evidence of suspicious circumstances, the plaintiff must show that sufficient negative factors were apparent to the sellers *at the time of the sale* to arouse a prudent person's suspicions as to the potential buyer's intentions, and must not rely solely on facts which a thorough investigation of the buyers, if undertaken, would have revealed. *Harman v. Willbern,* 374 F.Supp. 1149, 1159 (D.Kan.1974),

*aff'd,* 520 F.2d 1333 (10th Cir.1975); Brodsky and Adamski, *supra* at § 5:4.

**B. Applying the Doctrine in this Context**

■ The Sequa Defendants argue that even if this Court were to rule that the Rhode Island courts would recognize a cause of action brought under the *Insuranshares* theory of liability, they are still entitled to summary judgment because the facts here prevent Plaintiff from establishing a duty of care—or breach thereof—under the doctrine as a matter of law. However, viewing the facts in the light most favorable to the Receiver, it is clear that Plaintiff has discovered evidence which could cause a reasonable trier of fact to find facts establishing a duty of care under the *Insuranshares* doctrine. Here, Sequa and Chromalloy owned and controlled the insurance companies and were responsible for negotiating their sale to Christopher and Reeder. As corporate managers and controllers, they had a fiduciary relationship with these corporations and their policyholders. Where this fiduciary relationship is present, the *Insuranshares* standard imposes a duty on those in control of the corporation to refrain from negligently selling control of the corporation to potential looters when suspicious circumstances are present. 35 F.Supp. at 25; Brodsky and Adamski, *supra* at § 5:3.

Here, the Receiver has discovered evidence that could lead a reasonable trier of fact to find a breach by the Sequa Defendants of their duty of care. Plaintiff plans to place evidence before the trier of fact that Sequa was on notice prior to the sale that Christopher and Reeder lacked adequate independent financing to purchase control of AUIC and CUIC. Further, Plaintiff plans to introduce evidence that the Sequa Defendants were not only aware that Christopher and Reeder intended to finance their purchase of the insurance

companies with AUIC and CUIC's own assets, but that high-ranking Sequa officials consented to this arrangement and conspired with the buyers to hide this facet of the deal from the regulators. Plaintiff also intends to show that at the time of the transfer Sequa and Chromalloy were aware of Christopher's reputation for past fraud and also knew that Christopher had made material misrepresentations to them regarding his employment history and financial status. Finally, Plaintiff plans to produce evidence at trial that Chromalloy officials initially terminated negotiations with Christopher due to distrust and suspicion, only to reopen these negotiations without additional investigation when no other buyers could be found. Such evidence, when viewed in a light most favorable to the Receiver, could lead a reasonable trier of fact to conclude that the Sequa Defendants were aware of enough suspicious circumstances about Christopher and Reeder to prompt a prudent person in their position to investigate these buyers prior to the sale, and that their failure to do so amounted to negligence. It is clear, therefore, that genuine disputed issues of material fact remain as to each of these questions (duty and breach of duty).

■ The Sequa Defendants also argue that the *Insuranshares* duty of care cannot apply in the context of a transfer subject to external regulation by an administrative agency, such as the DBR. However, a state law requirement that a regulatory agency approve a corporate control transfer cannot extinguish the independent fiduciary duty to act in the insurance companies' best interest when completing a control transfer. *See Teixeira*, 699 A.2d at 1386; *Point Trap Co.*, 199 A.2d at 596. Likewise, a required administrative inquiry cannot subvert a fiduciary's duty to investigate suspicious circumstances he or she knows to be surrounding a corporate control transfer. As the Fourth Circuit held in *Swinney:*

> [I]f the sellers of control are in a position to foresee the likelihood of fraud on the corporation ... at the hands of the transferee, their fiduciary duty imposes a positive duty to investigate the motives and reputation of the would be purchaser; and unless such a reasonable investigation shows that to a reasonable man no fraud is intended or likely to result, the sellers must refrain from the transfer of control.

480 F.2d at 578 (internal citations omitted).

Here, Plaintiffs plan to show not only that suspicious circumstances existed before the control transfer to RHI prompting the Sequa Defendants to initiate an internal investigation of the buyers, but also that Sequa and its representatives conspired with Christopher and Reeder to defraud the DBR by withholding material evidence from its Form A Hearing. In light of such evidence, a reasonable trier of fact could find that the regulatory process commenced by the DBR was completely insufficient to satisfy the Sequa Defendants' fiduciary responsibility to the insurance companies and their policy holders, and, as such, that the Sequa Defendants breached their duty of care to AUIC and CUIC under the *Insuranshares* standard. Whether the facts established at trial amount to suspicious circumstances necessitating an investigation remains a question for the trier of fact.

The Sequa Defendants are unable to show that they are entitled to judgment as a matter of law on Count III. As a result, the motion for summary judgment on Count III is denied.

## V. Proximate Cause

■ The Sequa Defendants' final argument applies to all remaining counts of Plaintiff's Amended Complaint, and con-

cerns proximate cause. The Sequa Defendants argue that they are entitled to summary judgment on Counts III, V, and VI because the testimony of Plaintiff's proposed expert witness on damages, R. Larry Johnson, is insufficient to establish proximate causation between the so-called looting transactions and economic loss on the part of AUIC and CUIC. Proof of damages proximately caused by a defendant's conduct is an essential element of a plaintiff's claim. As the United States Supreme Court has observed, "the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

■■■ Essentially, the Sequa Defendants argue that Johnson's proposed opinion testimony amounts to a "but-for" analysis, failing to exclude certain outside variables, such as market factors, as the cause of the insurance companies' descent into receivership. Defendants suggest that this evidence is insufficient to establish proximate cause between the Sequa Defendants' actions and Plaintiff's damages. As the Sequa Defendants point out, proof of damages under Rhode Island law requires both proof of but-for causation and proof that the defendant's actions are the legal cause of the plaintiff's injury. *See DiPetrillo v. Dow Chemical Co.,* 729 A.2d 677, 692 (R.I. 1999). A plaintiff cannot recover for harm properly attributable to independent market forces or other events if those constitute an intervening cause of the damages suffered. *See Pantalone v. Advanced Energy Delivery Systems, Inc.,* 694 A.2d 1213, 1215 (R.I.1997); *see also First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994).

Here, however, rather than supporting their argument that Plaintiff cannot prove damages stemming from the Sequa Defendants' actions, the motion takes on the character of a motion in limine objecting to Plaintiff's proffered expert testimony as inadmissible under Rule 702 of the Federal Rules of Evidence. Any motion for summary judgment on these grounds is premature, as it is made before this Court has had the opportunity to hold a *Daubert* hearing and consider the admissibility of Plaintiff's proffered expert testimony. As the Supreme Court held in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Rule 702 of the Federal Rules of Evidence establishes a standard of evidentiary reliability which a trial judge, as a gatekeeper, must enforce to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." Although the Supreme Court has afforded trial courts substantial latitude in deciding what procedure is necessary in the context of a given case to properly test a potential expert's reliability, *see Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), conducting a voir dire hearing in limine has become an accepted practice in the federal courts when an opposing party raises a material dispute as to the admissibility of expert scientific evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1319 n. 10 (9th Cir. 1995), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995); *see also* G. Michael Fenner, *The Daubert Handbook: The Case, Its Essential Dilemma, and Its Progeny,* 29 Creighton L.Rev. 939, 957 (advocating early pretrial Fed.R.Evid. 104(a) hearings as a preferred vehicle for exercising admissibility evaluations of expert testimony). As the First Circuit has recognized, "The ultimate purpose of the *Daubert* inquiry is to determine whether

the testimony of the expert would be helpful to the [trier of fact] in resolving a fact in issue." *Cipollone v. Yale Indus. Prod., Inc.*, 202 F.3d 376, 380 (1st Cir.2000). This writer refuses to make such evidentiary rulings in a vacuum, without the benefit of the expert witness' testimony and any offered to oppose it. An evidentiary hearing under Rule 104(a) is the proper vehicle to evaluate the admissibility of Plaintiff's proffered expert testimony.

Further, the Sequa Defendants' sole proximate cause argument concerns the admissibility of Johnson's proposed expert testimony. Plaintiff is not, however, relying solely on Johnson's testimony to establish damages. *See* Plaintiff's Brief at 54, n. 47. Thus, even if this Court were to exclude Johnson's testimony, as requested, the Sequa Defendants would still not be entitled to summary judgment on this ground. As a result, the Court denies the Sequa Defendants' motion for summary judgment as to all remaining Counts. The Sequa Defendants may file a motion for a *Daubert* hearing as to Johnson's proferred testimony if they continue to challenge its admissibility.

## CONCLUSION

For the aforementioned reasons, this Court hereby denies the Sequa Defendants' Motion for Summary Judgment on Counts III, V, and VI of the Amended Complaint. These claims will proceed to trial in due course. No judgment shall enter in this case until all claims are resolved.

It is so ordered.