Thomas **HALL**, Plaintiffs,

v.

**EKLOF MARINE CORPORATION; Thor Towing Corporation; Odin Marine Corporation; Leslie Warren; and Gregory R. Aitken, Defendants.**

No. CIV.A. 02–162L.

United States District Court, D. Rhode Island.

Oct. 13, 2004.

W. Mark Russo, Esq., Christopher M. Mulhearn, Esq., Ferrucci Russo P.C., Providence, RI, for Plaintiffs.

Herbert B. Hulberg, Esq., New York City, Matthew Oliverio, Esq., Raymond A. Marcaccio, Esq., Providence, RI, Thomas M. Russo, Esq., Freehill, Hogan & Mahar, LLP, New York City, Deming E. Sherman, Esq., Richard A. Sherman, Esq., Edwards & Angell, Providence, RI, for Defendants.

OPINION AND ORDER

LAGUEUX, Senior District Judge.

This matter is before the Court on Defendants' Renewed Motion for Summary Judgment on all five counts in the Complaint. Thomas Hall ("Plaintiff") has brought this lawsuit against Defendants Eklof Marine Corporation, Thor Towing Corporation, Odin Marine Corporation, Leslie Warren, and Gregory R. Aitken ("Defendants"). The corporate defendants are three affiliated companies, who owned and operated the tugboat *Scandia* and the barge *North Cape* in January 1996, when it ran aground and spilled 828,000 gallons of home heating oil in Rhode Island and

Block Island Sounds. Defendant Leslie Wallin, a New Jersey resident, was a shareholder, director and president of Eklof, and was responsible for overseeing the maintenance and repairs on the vessels. Defendant Gregory R. Aitken, a New York resident, was an Eklof employee and the captain of the *Scandia* on January 19, 1996.

Plaintiff is a lobsterman who operates a lobster fishing boat, the *F/V Manning,* in Narragansett Bay. Plaintiff's claim is that the so-called *North Cape* Oil Spill caused a diminution in his lobster catch, resulting in a loss of income starting two years after the event.

Plaintiff's Complaint contains five counts. Count I alleges that Defendants are strictly liable under the Rhode Island Environmental Injury Compensation Act ("Rhode Island Act"). R.I. Gen. Laws § 46–12.3–1 *et seq.* (1956). Count II alleges that Defendants were negligent and seeks recovery under the same Act. R.I. Gen. Laws § 46–12.3–4. In Count III, Plaintiff alleges that Defendants were guilty of common law negligence. In Counts IV and V, Plaintiff prays for punitive damages.[1]

Defendants contend that Plaintiff has not shown a causal connection between the *North Cape* Oil Spill and the diminution in his lobster catch. They argue further that, even if Plaintiff can establish causation, his loss cannot be quantified because it is impossible to determine which losses are due to the Oil Spill and which are due to other environmental factors. For the reasons that follow, this Court concludes that Plaintiff has not presented sufficient evidence to establish that the *North Cape* Oil Spill actually and proximately caused the diminution in his lobster catch. Therefore, this Court grants Defendants' Renewed Motion for Summary Judgment on all Counts of the Complaint.

Defendants have also moved to strike the testimony of Plaintiff's experts, fisheries biologist Kathleen Castro and oceanographer Dr. Richard Crawford. Defendants filed a Motion in Limine to exclude Ms. Castro's testimony under Rule 702 of the Federal Rules of Evidence. Because the Court grants Defendants' Motion for Summary Judgment, it need not resolve Defendants' Motion in Limine.

Defendants moved to strike Dr. Crawford's testimony because, in contravention of Rule 26 of the Federal Rules of Civil Procedure, Plaintiff failed to disclose Dr. Crawford as an expert witness until July 8, 2003, the day before the extended discovery deadline expired. Defendants' motion was granted by this Court, from the bench, on September 29, 2003.

## BACKGROUND

### I. Factual Synopsis

In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 106 (1st Cir.1997)(citing *Blanchard v. Peerless Ins. Co.,* 958 F.2d 483, 490 (1st Cir.1992)). With the above rule in mind, the Court recites the following factual account.

This action arises out of the *North Cape* Oil Spill, which occurred on January 19, 1996, off the southern coast of Rhode Island. The tug *Scandia,* with the barge *North Cape* in tow, left Bayonne, New Jersey, for Providence, Rhode Island, on January 18, 1996. The *North Cape* was fully loaded with approximately ninety-five

---

**1.** Counts IV and V are duplicative and will be addressed together.

thousand barrels—four million gallons—of number two home heating oil.

The day before the *Scandia* and *North Cape* commenced their voyage, a severe winter storm was forecast to pass over Rhode Island's coastal waters on January 19, 1996. Specifically, the forecast predicted winds of thirty-five knots and seas rising to twelve feet. Early the next day (the day of the Oil Spill), the United States Coast Guard issued a storm warning, predicting severe weather for the area within twenty-five nautical miles of Watch Hill, Rhode Island, and Chatham, Massachusetts. Unlike the other vessels in Defendants' fleet, the *Scandia* and *North Cape* continued their journey en route to Providence.

During this journey, Defendants were operating the *North Cape* without an anchor windlass. The anchor windlass is a large drum and cable assembly that was part of the equipment needed to raise and lower the *North Cape's* six-thousand pound anchor. The windlass was equipped with a braking and brake release mechanism that, when operable, enabled the crew to easily lower the anchor. Defendants operated the *North Cape* without this windlass on the day of the Oil Spill because the windlass was broken and in need of repair. Instead, they used a shackle, wire and rope to create a makeshift rigging to hold the anchor in place. A steel anchor cable was replaced with polypropylene rope, which was not secured to the barge. The members of the crew were instructed to deploy the anchor only in case of an emergency because the makeshift anchor rigging made it extremely difficult to deploy.

In fact, as the events of January 19, 1996, unfolded, the crew was unable to lower the anchor because of the weather conditions that existed that day. As a result, both the *Scandia* and the *North Cape* grounded off Moonstone Beach when the *Scandia* caught fire. The *North Cape* discharged 828,000 gallons of oil into Block Island and Rhode Island Sounds causing substantial damage to the environment and killing lobsters, other marine life, and migratory birds. It was the largest oil spill in Rhode Island's history.

The Oil Spill contaminated a stretch of approximately nine miles along the South County beaches from Point Judith to Charlestown beach, an area known as the Nebraska Shoals. Federal and State authorities identified these waters as "the affected area" and closed the area to lobster fishermen until June 30, 1996. The affected area did not extend into Narragansett Bay.

On September 9, 1996, the National Oceanic and Atmospheric Administration, the Rhode Island Department of Environmental Management, the United States Department of the Interior, and the United States Fish and Wildlife Services released a joint Restoration Plan and Environmental Assessment ("Restoration Plan") for the *North Cape* Oil Spill. The Restoration Plan reported that authorities removed nearly 2.9 million dead and moribund lobsters from southern Rhode Island beaches following the Oil Spill, which killed a total of approximately nine million lobsters.

One of the Restoration Plan's objectives was to counteract the effects of the *North Cape* Oil Spill on Rhode Island's lobster resources by replacing the lost lobsters. As part of this plan, which commenced in the year 2000, 1.5 million female lobsters were placed in the waters off the Nebraska Shoals and in Narragansett Bay in an effort to replenish the population. Defendants and other interested parties paid approximately eleven million dollars to implement the Restoration Plan.

Plaintiff had fished for many years in central Narragansett Bay, an area with an approximate boundary, at its southernmost point, seventeen miles north of the Nebraska Shoals. Plaintiff contends that because of the *North Cape* Oil Spill, his annual catch diminished from 45,743 pounds of lobster landed in 1996 to 20,845 pounds landed in 2000, although he fished for relatively the same number of days each year. Plaintiff maintains that the lobsters killed by the Oil Spill would have otherwise migrated to his accustomed fishing ground in the middle region of Narragansett Bay, and subsequently been caught in his traps.

The *North Cape* Oil Spill was a catastrophic environmental disaster that resulted in significant and substantial damage to Rhode Island's lobster industry. However, it is undisputed that other factors unrelated to the Oil Spill, such as over-fishing, increased predation, disease, and water temperature fluctuations also have had negative effects on that local industry.

## II. Procedural History

Plaintiff filed his Complaint in the Rhode Island Superior Court on January 16, 2002. Defendants removed the case to this Court on April 5, 2002, pursuant to 28 U.S.C. § 1441, based upon the parties' diversity of citizenship and an amount in controversy of over $75,000. 28 U.S.C. § 1332(a)(1).[2] Following removal, this Court issued a Scheduling Order stating that discovery would close on December 20, 2002. After the close of discovery, Plaintiff filed a motion to enlarge the time for discovery. The Court denied this mo-

tion due to Plaintiff's lack of diligence in conducting discovery. On March 6, 2003, Plaintiff moved for reconsideration, which was again denied because Plaintiff had not provided any justification for disregarding the Court's Scheduling Order. In the meantime, Defendants had also moved for summary judgment, which Plaintiff opposed. Defendants also moved to strike the affidavit of Plaintiff's sole expert witness, Kathleen Castro. That motion was scheduled for hearing along with Defendants' motion for summary judgment.

During the hearing on these motions, this Court learned that Plaintiff had recently retained new counsel. In response, the Court permitted Plaintiff to enter the Castro affidavit into the record, in an effort to ensure Plaintiff a fair opportunity to present his case. Discovery was then reopened and Defendants had an opportunity to depose Ms. Castro. Plaintiff was also permitted to depose Defendants' expert witnesses.

On July 8, 2003, the day before discovery was to close a second time, Plaintiff introduced a new, previously-undisclosed expert witness, Dr. Richard Crawford, a marine researcher associated with Woods Hole Oceanographic Institution. Defendants made a motion to strike Dr. Crawford's testimony, which the Court granted because the disclosure of that witness was untimely. Defendants also made a Motion in Limine to preclude Ms. Castro's testimony, as well as a Renewed Motion for Summary Judgment on all counts asserted in the Complaint. Plaintiff objected and oral arguments were heard on September 29, 2003. The Court took the matters under advisement. As these matters have

**2.** As this case also implicates admiralty law, this Court, in addition, has original federal question jurisdiction pursuant to Article III, Section 2, of the United States Constitution, and 28 U.S.C. § 1331. *See Doyle v. Huntress,*

*Inc.,* 301 F.Supp.2d 135, 140 (D.R.I.2004)(citing 28 U.S.C. § 1331 (1980)(the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States)).

been fully briefed and argued, they are now in order for decision.

## DISCUSSION

Defendants moved for Summary Judgment on all counts asserted against them under Rule 56(c) of the Federal Rules of Civil Procedure, which sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The critical inquiry is whether a genuine issue of material fact exists. *Menebhi v. Mattos,* 183 F.Supp.2d 490, 498 (D.R.I.2002). There is a genuine dispute over a material fact when the evidence is such that a reasonable jury could find for the nonmoving party. *Morrissey v. Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 (1st Cir.1995)(*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In determining whether summary judgment is appropriate, the Court must view the facts in the record and all inferences therefrom in the light most favorable to the nonmoving party. *Springfield Terminal Ry. Co.,* 133 F.3d at 106. Where the facts support plausible yet conflicting inferences on a central issue in the case, the Court may not choose between such inferences on a motion for summary judgment. *Menebhi,* 183 F.Supp.2d at 498 (*citing Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir.1995)).

To prevail on a summary judgment motion, the moving party must identify the portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997)(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *McConaghy v. Sequa Corp.,* 294 F.Supp.2d 151, 159 (D.R.I.2003). As the Rhode Island Supreme Court has written, "Nevertheless, the party opposing summary judgment may not rest upon mere allegations or denials in its pleading and has an affirmative duty to set forth specific facts showing a genuine issue of fact to be resolved at trial." *Russian v. Life–Cap Tire Services,* 608 A.2d 1145, 1147 (R.I.1992). The United States Supreme Court has observed that Rule 56(c) mandates an entry of summary judgment against a party who fails to make a sufficient showing to establish an element essential to that party's case, and on which that party bears the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The test is whether or not, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *DeNovellis,* 124 F.3d at 306 (citing *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505).

Since a basis for the Court's jurisdiction is the parties' diversity of citizenship, the Court must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In this case, it is not disputed by the parties that Rhode Island law governs the resolution of Plaintiff's claims. Consequently, an extensive choice of law analysis is unnecessary and this Court will apply Rhode Island law where appropriate.

Count I of Plaintiff's Complaint asserts a claim for strict liability under the Rhode Island Environmental Injury Compensa-

tion Act. R.I. Gen. Laws § 46–12.3–2.[3] Count II charges negligence and seeks damages under the next section of the Rhode Island Act. R.I. Gen. Laws § 46–12.3–3.[4] One purpose of the Rhode Island Act is to limit the task of a plaintiff by relieving him or her from the requirement of establishing that the plaintiff is owed a duty of due care by the defendant. To maintain an action under the Rhode Island Act, a plaintiff need only establish that he or she suffered damages as a result of defendant's negligence or regulatory violation.

Count III of Plaintiff's Complaint asserts a claim under a theory of common law negligence. To maintain a cause of action for negligence under Rhode Island law, a plaintiff must establish: 1)a duty owed by the defendant to the plaintiff; 2)a breach of that duty; 3)factual and legal causation between the defendant's conduct and the plaintiff's injury; and 4)actual loss or damage. *Liu v. Striuli*, 36 F.Supp.2d 452, 466 (D.R.I.1999); *Mills v. State Sales, Inc.*, 824 A.2d 461, 467 (R.I.2003).

Counts IV and V urge that punitive damages be imposed on all Defendants based on their intentional, deliberate, wanton and reckless conduct, or, in the alternative, their willful, reckless or wicked conduct.

In their motion for summary judgment on all counts in Plaintiff's Complaint, Defendants charge that Plaintiff has failed to demonstrate through adequate scientific evidence or expert testimony that he can support the causation element of a negligence case against Defendants. Defendants, through their experts[5], contend that the decline in Plaintiff's lobster catch is a widespread problem, caused by many factors unrelated to the *North Cape* Oil Spill, including over-fishing, predation, disease, and changes in water temperature. Defendants argue further that Plaintiff is unable to identify and quantify the losses that were due to the Oil Spill and those that were due to these other factors.

In order to support his claims in the face of Defendants' challenge, Plaintiff must be able to show that the lobster population in the geographic area where he fishes was affected by the Oil Spill, and that those effects are distinct and separable from other factors that have affected the lobster population in New England waters in recent years.

---

**3.** R.I. Gen. Laws Section 46–12.3–2 reads, in its entirety: **Strict liability.**—The owner, operator, and/or his or her or its agent of any seagoing vessel, as defined in § 46–9–2, entering the waters or waterways of this state who shall violate the provisions of chapter 9 or 9.1 of title 46, regarding the obligation of a vessel to have a licensed pilot on board prior to entering a navigable waterway of the state or chapter 12 of title 46, regarding water pollution or any violation of any permit, rule, regulation, or order issued pursuant thereto, shall be strictly liable for any injury or damage resulting from the violation, including, but not limited to, damage or injury to the environment or natural resources of the state, injury to the person, property damage, or economic loss to any individual, corporation, partnership, or other business entity.

**4.** R.I. Gen. Laws Section 46–12.3–3 states in its entirety: **Action on negligence.**—Any person who sustains personal injury, property damage, or economic loss as a result of the negligent act of any owner, operator, and/or his or her or its agent of any seagoing vessel as defined in § 46–9–2, entering the waters or waterways of this state, shall be entitled to maintain an action to recover the damages pursuant to the provisions of § 46–12.3–1.

**5.** Defendants rely significantly on a report prepared for the purposes of this litigation by Dr. Richard Cooper of the University of Connecticut and Dr. Michael Clancy of Boston University. The report is titled, "Analysis of Possible Effects of the North Cape Oil Spill on Lobster Landings in Rhode Island."

Both Defendants and Plaintiff have provided scientific evidence on the issue of the migratory patterns of lobsters. This information is important to Plaintiff's claims because the area where Plaintiff fishes is, at its closest point, seventeen miles north of the waters designated as "the affected area" by the Restoration Plan. The area where Plaintiff fishes in Narragansett Bay was never closed to fishing following the Oil Spill. However, Plaintiff maintains, and Defendants vigorously dispute, that lobsters from the affected Nebraska Shoals area, had they not died as a result of the Oil Spill, would have migrated into Narragansett Bay and been caught in Plaintiff's traps.

While Plaintiff's argument is somewhat speculative, the Court acknowledges that Plaintiff has provided enough evidence of lobster migration to establish a genuine issue of material fact on this aspect of the case. This evidence is contained in an abstract entitled "Movements of Tagged American Lobster, *Homarus Americanus,* Off Rhode Island," published in 1980 in Volume 78, Number 3, of the Fishery Bulletin.[6] The abstract is cited by Plaintiff's expert fisheries biologist Kathleen Castro in her affidavit, where she explains that the data gathered from more recent lobster tagging efforts that she has undertaken on behalf of the Rhode Island Lobstermen's Association corroborates the findings outlined in the abstract. Affidavit of Kathleen Castro, paragraph 8. The data she has gathered "clearly demonstrates the constant and consistent inward and/or outward movement of lobsters tagged in, and outside, of Narragansett Bay." Castro Aff., par. 8.

Plaintiff has succeeded in creating a genuine issue of fact in dispute concerning lobster migratory patterns. Nonetheless, he stumbles on the crucial causal connection between the Oil Spill that occurred off Moonstone Beach and the diminution in Plaintiff's lobster catch more than seventeen miles away in Narragansett Bay two years later.

Since neither party has raised the issues of duty and breach, this Court assumes for purposes of this motion that Defendants owed and breached their duty of care to Plaintiff. Similarly, in analyzing Plaintiff's claims under the Rhode Island Act, the Court assumes that Defendants' conduct leading up to the Oil Spill represented not only negligence, but a violation of a rule or regulation as contemplated by R.I. Gen. Laws § 46–12.3–2. Likewise, accepting Plaintiff's calculations that he suffered a significant and quantifiable diminution in his lobster catch from 1996 to 2000, it is assumed that Plaintiff would be able to establish damages at trial. These assumptions leave the Court confronted only by the third element of the prima facie case for negligence or strict liability: causation.

The notion of causation is incorporated in the statutory language of the Rhode Island Act as "... injury or damage *resulting from* the violation," or "... injury, property damage, or economic loss *as a result of* the negligent act ..." (Emphasis added). Consequently, it is a necessary element of the causes of action stated in Counts I, II and III of Plaintiff's Complaint, which must be proved in order for Plaintiff to recover and before the punitive damages requested in Counts IV and V may even be considered.

In order to establish causation, a plaintiff must show that the defendant's breach of duty was the actual and legal

6. The authors of this abstract were Michael J. Fogarty, David V.D. Borden and Howard J. Russell.

cause of the plaintiff's harm. *Liu v. Striuli*, 36 Fed.Supp.2d at 466. A plaintiff establishes factual or actual causation by showing that the harm to the plaintiff would not have occurred "but for" the defendant's negligence. *Evans v. Liguori*, 118 R.I. 389, 374 A.2d 774, 777 (1977).

The plaintiff must establish this causal connection by competent evidence. *Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 119 R.I. 935, 382 A.2d 514, 517 (1977)(citing *Sylvia v. Gobeille*, 101 R.I. 76, 79, 220 A.2d 222 (1966)). Because the issues in dispute, the health and habits of the local lobster population, are beyond the scope of general knowledge of the ordinary juror, Plaintiff must rely on the testimony of his expert witness to provide competent evidence of causation. Fed.R.Evid. 702.

On the issue of expert testimony, the Rhode Island Supreme Court has held:

> It is well settled here in this state that when the only evidence offered to establish causal relationship between one person's activities and another's injuries is the testimony of a medical expert, such evidence must speak in terms of "probabilities" rather than "possibilities." Expert testimony, if it is to have any evidentiary value, must state with some degree of positiveness that a given state of affairs is the result of a given cause. Absolute certainty, of course, is not required. In those cases, where expert testimony is relied on to show that out of several potential causes a given came from one specific cause the expert must report that the result in question "most probably" came from the cause alleged.

*Sweet v. Hemingway Transport, Inc.*, 114 R.I. 348, 333 A.2d 411, 415 (1975).

In the *Sweet* case, plaintiff was involved in a six-car pileup in a snowstorm on Route 95. Plaintiff's doctor thought it was possible that plaintiff's subsequent back pain was caused by the car accident, but the doctor was also unable to exclude other explanations which, he stated, were equally plausible. *Sweet*, 333 A.2d at 415. In *Montuori v. Narragansett Electric Co.*, 418 A.2d 5 (R.I.1980), the Rhode Island Supreme Court applied the *Sweet* standard to other expert testimony, when discounting the testimony of an electrical engineer who opined as to the cause of a fire in plaintiff's garage, because the expert admitted repeatedly during his testimony that he was "speculating." 418 A.2d at 11.

In the present case, Plaintiff must show that the Oil Spill was the actual and proximate cause of the diminution in his lobster catch. If Plaintiff does not present evidence of causation, he will not succeed in meeting an essential element of his negligence and strict liability claims and this Court will be compelled to grant Defendants' summary judgment motion. *See Munroe v. Cheaters Holding Corp.*, 808 A.2d 645, 646 (R.I.2002)(holding that while proximate cause is ordinarily a determination that involves a question of fact, summary judgment is proper when a plaintiff fails to present evidence that the defendant's negligence was the proximate cause of the plaintiff's injury or evidence from which a reasonable inference of proximate causation may be drawn); *accord Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 467 (R.I.1996)(citing *Russian v. Life–Cap Tire Services, Inc.*, 608 A.2d 1145, 1147 (R.I.1992)).

In this case, Plaintiff relies almost exclusively on the expert testimony of fisheries biologist Kathleen Castro.[7] Ms. Castro is the Director for the Sea Grant Fisheries

---

**7.** Plaintiff's exclusive reliance on Ms. Castro was not entirely intentional on his part, as his second expert was proposed too late and was excluded by the Court.

Extension Program at the University of Rhode Island. In support of his claims, Plaintiff has submitted a ten paragraph affidavit from Ms. Castro. In Paragraphs One, Two and Three, Ms. Castro outlines her credentials and experience, and explains her familiarity with the *North Cape* Oil Spill and her participation in various lobster tagging and migration studies subsequent to the Oil Spill.

In the fourth paragraph, Ms. Castro states that she has reviewed the report prepared by Defendants' experts and says, "In my opinion, this study contains several inaccurate or incorrect statements, representations, and/or conclusions." In Paragraph Five, she states that she is aware of Plaintiff's claims, and "disagree[s] with Drs. Cooper and Clancy's conclusion that there is no measurable connection to the *North Cape* oil spill and Mr. Hall's diminished landings." In Paragraph Six, Ms. Castro describes the Restoration Plan.

In the seventh paragraph, Ms. Castro makes a conclusory leap: since the Restoration Plan mandated stocking lobsters in Narragansett Bay, then the lobster population in the Bay must have been adversely affected by the Oil Spill. "The restoration and restocking project," Ms. Castro states, "did not undertake to rehabilitate the lobster population and/or resource in areas other than those that have been identified and recognized as having been impacted by the *North Cape* oil spill."

The eighth paragraph addresses the issue of lobster migration, and Ms. Castro disputes the position of Defendants' experts on this issue.

In Paragraph Nine, Ms. Castro addresses the issue raised by Defendants' experts that, within the time period of Plaintiff's

diminished catch, lobster landings [8] have declined all over Rhode Island, Massachusetts and Long Island Sound. Ms. Castro points out that in 1996, the year of the Oil Spill, Rhode Island scientists measured the lowest settlement index in recorded history. The Settlement Index measures the number of lobster larvae that settle to the ocean bottom following spawning. Ms. Castro states that a sequential decline by class size in lobster population has been observed since 1996. She concludes by stating, "The *North Cape* oil spill can't be discounted as contributory to the decline and depletion in the commercial fishery, which now affects Mr. Hall, as well as other lobstermen."

In the final paragraph, Ms. Castro takes issue with the Defendants' experts' use of landings data to support their claims. Because a lobster can be "landed" far from where it was caught—for example, a Narragansett Bay lobster might be included as part of a landing in New Bedford, Massachusetts—this data is not the best evidence to establish the decline or abundance of a regional lobster population.

In addition to the affidavit of Kathleen Castro, Plaintiff has presented reports of four scientific studies. These will be scrutinized in turn.

1) *North Cape Oil Spill: Synthesis of Injury Quantification and Restoration Scaling for Lobsters,* by Deborah French. This report was prepared in 1999 for submission to the National Oceanic and Atmospheric Agency Damage Assessment Center. This report summarizes the scientific research estimating the number of lobsters killed as a result of the Oil Spill, and summarizes the various proposals for restoring the lobster population. The author

---

8. "Landings" refers to the number of lobsters reported caught in a given area at the time of the boat's docking.

concludes that, based on the number and ages of lobsters killed, as well as the projected life span of those lobsters, a total of approximately 2.2 million adult lobsters would be missing from the future population. French report, page 4. The author then discusses the relative merits of various restocking proposals, including restocking lobsters at the larval stage and restocking predominantly female lobsters of various ages. According to Plaintiff's Answers to Interrogatories, Ms. French would not be included as a potential witness, were this case to go to trial.

2) *Movements of Tagged American Lobsters, Homarus Americanus, off Rhode Island,* by Michael J. Fogarty, David V.D. Borden, and Howard J. Russell. This 1980 report outlines the results of several studies concerning the travel patterns of lobsters, in Rhode Island waters and elsewhere. The authors of this study provide support for Plaintiff's claim that lobsters from the affected area move into Narragansett Bay, to the area where Plaintiff fishes. The Plaintiff intended to call Mr. David Borden as a witness at trial.

3) The third report is labeled *Draft, Progress Report 1/2003, Recapture Information from: Rhode Island Lobstermen's Association (1999–2001), North Cape (2000–2001).* It was prepared by Plaintiff's expert, Kathleen Castro. This report provides raw data from a three-year study involving the tagging of 12,000 lobsters in and around the waters of Rhode Island. The data shows the numbers of lobsters tagged and recaptured, as well as the location of the recaptured lobsters and the potential physical hazards of the actual tagging procedures.

4) Plaintiff's fourth and final submission is entitled, *Equivalent Adult Estimates and Stock Status of Lobster Involved in the North Cape Oil Spill in Block Island Sound,* by Mark R. Gibson, Thomas E. Angell and Najih B. Lazar. This report was produced in 1997 under the auspices of the Rhode Island Department of Environmental Management, Division of Fish and Wildlife. In the Introduction, the authors assess the numbers of lobsters killed by the Oil Spill, explaining that, "Most of these losses were sublegal lobsters, raising the possibility that future fishery yields would be impacted." Gibson, et al., p. 1. The Introduction goes on to explain the scope of the report:

> In this study, growth, molting, and mortality rates are used to project to adult equivalents the lobsters killed and stranded on area beaches. The stock status of lobster in the Rhode Island inshore area is assessed. The adult equivalent losses are placed in the context of recent fishery landings and resource abundance trends.

Gibson, et al., p. 1.

This study examined the lobster population in Narragansett Bay, Rhode Island Sound and Block Island Sound. After extensively outlining their methodology and results, the authors summarize their findings, concluding, "Estimated absolute abundance from the model indicate that the spill has removed up to 25% of the prerecruits which will support future fisheries. The adult equivalent loss could approach 5% of the exploitable stock in future years." Gibson, et al., p. 15.

Plaintiff intended to call Mr. Mark Gibson and Mr. Thomas Angell as witnesses at trial.

■ Reviewing the evidence presented by the Plaintiff in its totality and in the light most favorable to the Plaintiff, Plaintiff's case that his lobster catch has been demonstrably and significantly diminished by the Oil Spill rests on the following potential testimony: 1) Ms. Castro who will testify that the Oil Spill cannot be

"discounted as contributory to the decline and depletion in the commercial fishery;" 2) Mr. Borden who will testify that lobsters do move to and from Rhode Island and Block Island Sounds and Narragansett Bay; and 3) Mssrs. Gibson and Angell who will testify that the death of 9 million lobsters, as a result of the Oil Spill, raised "the possibility that future fishery yields would be impacted."

It is important to note that, with the exception of Kathleen Castro, the other potential witnesses proffered by Plaintiff are offered as lay witnesses rather than experts. As such, their testimony at trial would be limited to observations based on their own perceptions, and not based on scientific or other specialized knowledge. Fed.R.Evid. 701.

While the Court is moved by the evidence concerning the devastating effects of the Oil Spill on the environment, the Court concludes that Plaintiff has not supplied sufficient evidence of causation for a jury to be able to return a verdict in his favor. The evidence to be supplied by Plaintiff's witnesses, both expert and lay, speaks in terms of "possibilities" not "probabilities," and does not state with sufficient degree of positiveness that Plaintiff's injuries are the result of the Oil Spill. *See Sweet v. Hemingway Transport, Inc.,* 333 A.2d at 415. When the nonmoving party's evidence is insufficiently probative to establish an essential element of his case, summary judgment is proper. *DeNovellis v. Shalala,* 124 F.3d at 306. Therefore, Defendants are entitled to summary judgment on Counts I, II and III of Plaintiff's Complaint.

### Punitive Damages

■ In Counts IV and V, Plaintiff sets forth claims for punitive damages against all Defendants. Punitive damages are awarded when the party seeking them proves that the party at fault acted with a willfulness, recklessness, or wickedness that amounts to criminality that should be punished. *Kingstown Mobile Home Park v. Strashnick,* 774 A.2d 847, 859 (R.I.2001); *Soares v. Ann & Hope of R.I.,* 637 A.2d 339, 351 (R.I.1994). An award of punitive damages serves to punish a tortfeasor who commits intentional or malicious wrongful conduct to deter such conduct in the future. *Soares,* 637 A.2d at 351(citing *Palmisano v. Toth,* 624 A.2d 314, 317–18 (R.I. 1993)). Whether or not the facts of a case warrant an imposition of punitive damages is a question of law for the trial court to decide. *LaPlante v. Am. Honda Motor Co., Inc.,* 27 F.3d 731, 745 (1st Cir.1994); *Soares,* 637 A.2d at 351 (citing *Sherman v. McDermott,* 114 R.I. 107, 108, 329 A.2d 195 (1974)).

■ Plaintiff has not established the element of causation necessary to hold Defendants liable for any damages under Counts I, II, or III, let alone punitive damages. Assuming that Plaintiff can meet the high standard of willfulness, recklessness, or wickedness that is necessary for a punitive damage claim, he has failed to show that such conduct on the part of Defendants proximately caused his loss. *D'Amato v. R.I. Hosp. Trust Nat'l Bank* 772 F.Supp. 1322, 1325 (D.R.I.1991); *Izen v. Winoker,* 589 A.2d 824, 829–30 (R.I.1991). Therefore, Defendants are entitled to summary judgment as a matter of law on Counts IV and V.

### Defendants' Motion in Limine

In addition to the Renewed Motion for Summary Judgment, Defendants' filed a Motion in Limine to preclude Kathleen Castro's testimony under Rule 702 of the Federal Rules of Evidence. Although this Court's grant of summary judgment on all Counts of the Complaint renders Defendants' Motion moot, this Court will briefly

discuss the propriety of filing a motion in limine at the summary judgment stage.

Defendants' Motion in Limine at this point in the litigation is premature because this Court has not had the opportunity to hold a *Daubert* hearing and consider the admissibility of Plaintiff's proffered expert testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 of Federal Rules of Evidence establishes a standard of evidentiary reliability which a trial judge, as gatekeeper, must enforce to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786. While the Supreme Court has given trial courts substantial latitude in deciding the necessary procedure to test a potential expert's reliability, *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), conducting a voir dire hearing in limine has become an accepted practice in the federal courts when an opposing party raises a material dispute as to the admissibility of expert scientific evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318–1319 n. 10 (9th Cir.1995). The First Circuit has recognized that the ultimate purpose of a *Daubert* inquiry is to determine whether the expert's testimony will aid the jury in resolving a disputed issue. *Cipollone v. Yale Indus. Prod., Inc.*, 202 F.3d 376, 380 (1st Cir.2000). The Court refuses to make evidentiary rulings on the admissibility of proffered expert testimony in a vacuum and without the benefit of the expert's testimony or that of any expert offered to oppose it. *McConaghy*, 294 F.Supp.2d at 169. A Rule 104(a) evidentiary hearing is the proper vehicle to evaluate the admissibility of a plaintiff's proffered expert testimony. *Id.* at 168–169. Therefore, even if this Court denied summary judgment, it would not entertain Defendants' Motion in Limine at this point in the litigation.

## CONCLUSION

For the aforementioned reasons, this Court grants Defendants' Renewed Motion for Summary Judgment on all Counts asserted against them in Plaintiff's Complaint. Defendants' Motion in Limine to strike Ms. Castro's testimony is denied and their Motion to Strike Dr. Crawford's testimony was granted during oral arguments. The Clerk shall enter judgment for all Defendants on Plaintiff's Complaint, forthwith.

It is so ordered.